27  539
30  325
30  421

No. 6270.

AUGUST ZWICKER v. THE STATE.

1. MURDER—VERDICT.—The statute expressly requires that in convictions
for murder the verdict shall specify the degree of murder of which the
defendant is found guilty. The failure of the verdict to so specify the
degree is cause for reversal.

2. REASONABLE DOUBT—CHARGE OF THE COURT.—The trial court in-
structed the jury as follows: "The defendant is presumed by the law
to be innocent until his guilt is established by competent evidence to
the satisfaction of the jury, beyond a reasonable doubt; and if you
have on your minds arising from the evidence a reasonable doubt as to
the guilt of the defendant, you will find him not guilty." Held, sufficient
on the doctrine of reasonable doubt, and not obnoxious to the objec-
tion that it "requires either the State or the defendant to introduce
affirmative evidence of the defendant's innocence;" nor to the further
objection that it contravenes the rule that a reasonable doubt may as
well arise from a want of evidence as from evidence intr, duced before
a jury.

3. DRUNKENNESS—CONFESSIONS—EVIDENCE.—The defense requested the
court to charge the jury in effect that if they believed the defendant
was so drunk that he did not realize what he was saying, when he
made his confession, such confession should not be considered as evi-
dence against him. Held, that the requested instruction was properly
refused because it not only rested upon no evidence of drunkenness,
but that pretense was refuted by the proof.

APPEAL from the District Court of Denton. Tried below be-
fore the Hon. D. E. Barrett.

The indictment charged the appellent with the murder of J.
S. Ferguson, in Denton county, Texas, on the first day of Jan-
uary, 1888. The jury found the defendant "guilty as charged
in the indictment," and assessed the penalty at a life term in
the penitentiary.

S. Ferguson, the father of the deceased, was the first witness
introduced by the State. He testified that the deceased was
killed at his house, in Denton county, Texas. He was shot
about half past seven o'clock on the night of January 1, 1888,
and died early on the next morning. The deceased's house
fronted east, the parlor being the east room. The bay window
occupied the center of the east end of the parlor. A public

road running north and south passed the front of the house at a short distance. The fatal shot was fired through the bay window, the half of one of the blinds of which was open. When he received his death wound the deceased was lying on a sofa or lounge in his said parlor. Powder stained the window sash, and the shot broke out about two-thirds of the window glass. The glass was broken out about four feet from the ground. The shot took effect in the left side of the head, one shot striking the arm. Witness picked up four or five common sized buckshot in the parlor. The couch, the wall at a point beyond where deceased's head lay, and an organ stool, showed shot marks. The front fence at deceased's house was about six rods distant from the front door. A plank walk led from the front gate to the front door. The road east of the house was sandy and tolerably dry. The yard east and south of the house was overgrown with Bermuda grass.

On his cross examination the witness said that he was at his home, about a mile and a half distant from deceased's house, when the shot was fired. He reached the deceased about an hour after the shooting. Deceased was then alive, but died about two o'clock on the next morning. The witness knew Rufe Street and Bill Maury. He did not see the said Street on the morning after the murder. He saw Bill Maury at deceased's house early next morning. The said Maury then told the witness that he thought he had a clue to the assassin, and showed the witness what he said was the measure of a man's track. Witness told Maury if he had a clue to follow it up. He did not hire Maury to trace the murderer, but told him that if he did find him, he, witness, would pay him for his trouble. This conversation between witness and Maury occurred at deceased's house a little after sunrise on the morning after the assassination. The witness employed E. C. Smith to assist in the prosecution of this case, but had nothing to do with the employment of Owsley & Walker as special prosecuting counsel. A large number of the residents of the neighborhood congregated at the house of the deceased after the shooting, on the fatal night.

W. B. Lee testified, for the State, on January 1, 1888, he lived near Elizabethtown in Denton county, Texas. Defendant then lived with Andy Peterson, west of Elizabethtown, and about a mile and a half distant from witness's house. Andy Peterson and the defendant's brother, Otto Zwicker, driving a bunch of yearlings, passed the witness's house on the evening of Sun-

day, January 1, 1888. Another man, whom witness would not attempt to identify, passed his house that evening, about two o'clock. He was walking, and traveled from west to east on the Roanoke road. That person could have either gone to Roanoke on that road, or have turned off on another road and gone across Denton creek. Witness took no particular notice of that man, who was about a quarter of a mile distant from him. He did not know where Homer Smoot lived at that time. Witness never told Bill Green or Ike Davis, soon after the ar- rest of defendant, that the State would have no trouble in trac- ing the defendant as far as his, witness's, house, as he, witness, could testify to seeing him pass his house on the evening of the fatal day, going in the direction of deceased's house.

Ed Smoot testified, for the State. that, on January 1, 1888, he lived about five or six miles east of Elizabethtown. On the evening of that day, about two hours before sundown, the wit- ness, his brother being with him, saw a man on foot in his pasture. He was traveling the road that led through the pasture, entering said pasture at the gate on the southwest corner, and going out at the northeast corner. At the outside of the pas- ture at the said northeast corner, the road forked, one of the forks leading to Denton, and the other off east towards Rufe Street's house. The man seen by witness traveling through the pasture on the said evening had a bundle on his back, about three feet long, done up in a "slicker." Under the impression that the man was a tramp, witness hallooed to him, but he made no reply. Witness did not see the man's face, and did not recognize him as anybody he knew. He, however, observed somewhat carefully the man's appearance as to form and build, and, a few days after the arrest of the defendant, pointed him out of a number of prisoners in jail as the one man in jail who resembled the man he saw in his pasture on the said Sunday evening. Witness was not then acquainted with defendant. Deceased lived about ten miles east from witness's pasture. Will Smoot, the brother of Ed Smoot, testified to substantially the same facts, and declared that there was no appreciable dif- ference in the general appearance of the defendant and of the man they saw in the pasture on the said Sunday evening. Will and Ed Smoot were sons of Homer Smoot.

Lem Card testified, for the State, that on January 1, 1888, he lived about three miles east of the place of Homer Smoot. About an hour before sunset on that evening a man on foot

passed the witness's place at a distance of between three and four hundred yards going east. He had a long bundle on his shoulder or back. That man, whom the witness could not recognize at the distance, walked rapidly, and traveled towards the houses of Rufus Street and A. J. Stykes. Deceased lived southeast of the witness.

On cross examination the witness said that his house was two or three miles distant from Rufe Street's house. Smoot's pasture was west from witness's house. The road to Roanoke via the witness's house did not pass Smoot's pasture. The man seen by the witness on the evening of the fatal Sunday was not traveling in the road, but was going easterly through the brush towards Street's house. From the point where witness was when he saw the man, it was southwest to the northwest (northeast?) corner of Smoot's pasture. On his re-examination the witness said the man, when he saw him, was east of Smoot's pasture, about three-quarter's of a mile distant, and west of Stykes's house, going towards said house.

A. J. Stykes testified, for the State, that he was at home on the evening of the fatal Sunday. He did not see any person pass by or through his premises on that evening, but before night he discovered an uncommonly large foot track in the orchard south of his house. The said tracks, only two of which the witness noticed, pointed towards the house of Rufe Street which was about one mile southeast from witness's place. Witness's wife was at home on that evening.

Mrs. A. J. Stykes testified, for the State, that late on the evening of the fatal Sunday she saw a man climb the fence from the orchard into the field south of her house, and go off through the field towards Rufe Street's house. That man had a bundle on his back which in shape resembled a fiddle. The sun was then about a quarter of an hour high.

Rufus Street testified, for the State, that now and on the first day of January, 1888, he lived in Denton county, Texas, about thirteen miles south of the town of Denton. Deceased lived four or five miles southeast from witness's house. The witness knew the defendant and saw him on the fatal Sunday evening. On that evening a man came to witness's house inquiring the way to the house of Pat Street, the brother of the witness. Witness went with that man to Pat Street's house, to show him the way; left that man at Pat's house and returned to his home. En route home, and at a point in the road near his house, the

witness met the defendant, who was on foot traveling the
Roanoke and Lewisville road. Witness stopped the defendant
with the remark: "Hallo! You are the man who had the law
suit with Ferguson." Defendant replied that he was the man.
Witness then asked him where he was going, and he replied
that he was going across Denton creek to work for a man.
Witness then asked him if he was still living at Peterson's.
He replied that he was not. Witness then remarked to him:
"You will be late getting to where you are going." Defendant
replied: "Yes, but I want to get an early start at work to-
morrow morning." He then asked witness the way to Maury's
house. Witness directed him and he left, when witness climbed
the fence and went home.

The point where witness met the defendant was at the south-
east corner of witness's place, in the road which, at that point,
ran north and south, and the hour was a few minutes—less
than fifteen—before sunset. While conversing, the witness
and defendant stood on opposite sides of the road, about three
feet apart. Defendant then had on his shoulder a long pack-
age that was broader at one end than the other. The package
was tied with a rope and swung from a stick which defendant
carried over his shoulder. Witness had previously met the de-
fendant at a late term of the county court in which a suit was
pending between the Zwickers and the Fergusons. Witness
was in attendance upon that term of the court as a regular
juryman. On Monday, January 2, 1888, being the day after
witness met the defendant in the road, and the day following the
assassination of deceased, witness went to Denton to attend the
public estray sale, and heard of the assassination of deceased
on the previous night. That information was imparted to him
by Bill Maury in Kinkaid's wagon yard. Witness then told
Maury that he saw the defendant in the road near his, wit-
ness's, house, late the previous evening. On the morning of
the next day, Tuesday, witness went with Bill and Riley Maury
to Peterson's house for the purpose of pointing out the defend-
ant as the man he met in the road on the evening of the fatal
Sunday.

When witness and the Maurys reached Peterson's house they
found Andy Peterson in his orchard; after talking with him
a short while, they went to a shop near the house. Outside of
and near the said shop they found the defendant, who appeared
to be mixing paint in a bucket. He had a shoe on one foot and

a wooden bottom slipper on the other, and was wearing the same coat and hat that he had on the previous Sunday evening. Witness identified the defendant at once and told Bill Maury that he was the man he met on the previous Sunday evening. They then took the defendant to the field where his brother Otto Zwicker was plowing, and witness again pointed out defendant to Bill Maury as the man he saw on the previous Sunday evening. The witness examined the defendant's foot on which he wore the wood bottomed slipper, but could discover no bruise on it. The foot may have been a little swollen, but if so witness did not observe it. The foot was wrapped with a rag on which there was a quantity of salve, but if the skin was broken or bruised the witness failed, after careful search for bruises or breaks, to discover it. Defendant had very large feet. From the field the witness and the Maurys took defendant to the house, where they got his other shoe and another hat, and thence they took him to Roanoke.

On his cross examination the witness said that when he met the defendant in the road on the evening of the fatal Sunday he observed the bundle he carried on his back, but only close enough to observe its shape, and that it was wrapped in what appeared to be a slicker. The interview between the witness and the defendant on the said Sunday lasted not more than two minutes, during which time the witness observed that defendant wore a black flopped hat and patched pants. It was on a public road that witness met the defendant,—a road flanked on either side by a fence, but was not what the witness would call a lane. Defendant was turning the corner of the fenced road or lane when witness first saw him. The witness was in the grave yard, digging a child's grave, when Bill Maury came for him on Tuesday to go to Peterson's. Witness at first told Maury that he felt unwell and did not want to go to Peterson's, but did not ask Maury if there was any money in going to Peterson's with him. Maury replied to the effect that old man Ferguson had agreed to pay well for working up the case. Witness did not tell Maury on that Tuesday morning that "the Dutchman told him (witness) on Sunday evening that he had left Peterson's." Riley Maury applied a stick measure to the man's track that was found near the witness's tank. The ground was wet at that point, and it looked like the man's foot had slipped. The stick measure did not appear to fit the track. Witness then asked the Maurys to go to the road near

his house where he met the defendant on the previous Sunday, and there measure the defendant's tracks, but they did not go.

En route to Peterson's, the witness and the Maurys went by Roanoke, crossing Denton creek near Walnut Grove school house. At a point just beyond Denton creek they found a man's track of very large size. That track was in the public road and showed that it was made by a man traveling toward Roanoke. Bill Maury got off his horse and measured that track. Witness and the Maurys ate dinner at Roanoke, bought a pint of whisky, and went thence to Peterson's house. They had no other whisky on that day. From Peterson's house they took defendant to Roanoke, and thence by rail to Denton. Witness saw John Bacon on the train between Roanoke and Denton, and told Bacon that the Maury boys had the defendant in an adjoining car, under arrest for killing deceased. At the same time he told Bacon that the Maurys wanted him, Bacon, to go into that car, talk to defendant, and see if he could not get him to confess. Bacon replied that it was not worth while, as the train would soon reach Denton. Witness was not drunk while on the train between Roanoke and Denton. Witness denied that he ever told Jonas Forrester that he had spent two hundred dollars on this case, and did not know how much it would eventually cost him. On Tuesday, witness asked Dick Maury if he did not, on the previous Sunday, meet a man with a budget on his back, and Dick replied that he did. Peterson's house was between fifteen and sixteen miles distant from deceased's house. Witness did not attend the funeral of deceased nor did he visit the deceased's house after the killing. Witness told Constable Sullivan, on Monday morning, about seeing defendant on the road on Sunday evening. Witness had not uttered an oath in five or six years.

The point on the road where witness met the defendant on the evening of the fatal Sunday, was between the Adams and Taylor places, and within a quarter of a mile of witness's house. He was coming from the direction of witness's house towards witness, who was returning to his home from the house of his brother Pat. He was turning the corner of witness's fence when witness first saw him. The witness spent Sunday night at the residence of the widow Heath, and got home between nine and ten o'clock on Sunday morning. He was at his home on the fatal Sunday night. Hannibal Street, witness's brother, who lived with the witness, was also at home that night. When

witness left home next morning to go to the estray sale in Denton, he left his brother Hannibal at home. It was late in the evening when he left Denton, and between eight and nine o'clock at night when he reached home. While talking to Bill Maury in Kincaid's wagon yard in Denton on the said Monday morning, the witness asked him if "that Dutchman" did not come to his house on the previous evening. Pat Street had a double barrelled shot gun at his house on January 1, 1888, but witness had no gun of any kind at that time, either at his house or elsewhere. Witness and deceased had a difficulty in Denton some time prior to the assassination, but at the time of the killing witness had no particular hard feelings towards deceased. Witness and Bill Fry had a talk with him on the day that the difficulty occurred between witness and deceased, and witness then told Fry that deceased was trying to raise a fuss with him. Deceased followed the witness about town on that day, but witness did not follow him. The witness denied that, on that day, he applied to R. C. Scripture for the loan of a pistol. He had a talk with said Scripture and asked him if he, Scripture, had heard of what deceased had said about witness. The witness knew Dr. Bush and had heard of Mr. Seagroves. Witness and the Maurys, when en route to Roanoke with the defendant on Tue s lay after the killing, met Dr. Bush and another man near a house between Peterson's house and Roanoke. Dr. Bush asked witness what the party was doing with defendant. Witness replied that he, defendant, was under arrest by the Maurys for the murder of deceased. The witness and the man with Dr. Bush had a conversation in the presence of Bush and the two Maurys. In that conversation witness asked that man if he saw the defendant on the previous Sunday evening, but did not say to that man: "Ferguson was a d—d rascal, and if defendant hadn't killed him I would have killed him." He made no such statement to Dr. Bush. En route home from Pat Street's on the fatal Sunday evening, witness passed Wakefield's place and saw John Wakefield.

John Wakefield testified, for the State, that he lived about two miles west from the deceased's house. About an hour before sunset on the evening of the fatal Sunday, the witness Rufe Street passed the witness's house, going towards his home. Between thirty and sixty minutes later a man, whom witness did not recognize, traveling on foot, passed witness's house going towards Yokeley's store, over the road which passed by

the house of the deceased. That man had a bundle on his back which looked like, and which witness took to be a gun case.

Dick Maury was the next witness for the State. As shown by a diagram in evidence this witness lived at or near the crossing of two roads. The road leading east from his house passed by the house of Mr. Bond, a quarter of a mile distant. The witness stated in substance that, about dusk on the fatal Sunday, he and his two sisters left home in a buggy to visit at Mr. Bond's house. En route they met a man on foot traveling north towards the point of intersection of the two said roads. That man had a budget of some kind on his back.

William Sparks, sheriff of Denton county, testified, in substance, that on the night of Tuesday, January 3, 1888, about twelve o'clock, jailer Boyd came to witness's boarding house, waked witness and told him that the man who killed deceased was in jail, and, in effect, that the said man had confessed to the murder of deceased. Witness went with Boyd to the jail, where he found Boyd's brother and young Mr. Ritter. He had no recollection of seeing either of the Maurys, or Fry or Rufe Street at the jail, though jailer Boyd told him that the latter was put under arrest and confined. On arriving at the jail Boyd, or somebody else, threw off the brakes and defendant came into the corridor from the cells. Witness said either "you are" or "are you the man who killed Ferguson?" Defendant replied: "I am." Witness said to him: "I want to inform you that if you make any statement in regard to the killing of Ferguson, it may be used in evidence against you, and if you make any statement to me about it I want you to state the facts just as they exist." Defendant then said that on "trial" day Rufe Street told him that he, Street, would give him, defendant, fifty dollars to kill Ferguson; that he, defendant, left home on the fatal Sunday and went by Rufe Street's house; not finding Street at home, he went on and met Street a short distance beyond the house, when Street directed him how to go on to Ferguson's house; that he, defendant, then went on to Ferguson's house, and fired through a window and shot Ferguson. He said that he fired but one shot, and that from a shot gun, and that he then left, going through the yard into the big road.

Cross examined the witness said that he understood from the defendant's statement that Street paid him fifty dollars. The place where the conversation between witness and defend-

ant took place was in the southeast corner of the corridor of the jail, about eight feet from the cells. The conversation was carried on in an ordinary tone of voice, the witness and defendant being separated by the iron grating. Witness visited deceased's house before the confession of the defendant, and saw the lounge on which deceased was said to have been lying when shot. There were shot marks on the said lounge. Witness understood that one of the window blinds was open at the time the shot was fired. Defendant appeared to witness to be perfectly sober when he made his confession. The witness had not been drinking, and he detected no odor of liquor on the breath or person of defendant. Defendant spoke in broken English, but was readily understood by witness, and witness presumed from his manner that he, defendant, understood witness's warning, that whatever statement he should make about the killing of deceased, would be used in evidence against him. Defendant was apparently a man of average intelligence. Witness knew nothing about what transpired between Rufe Street, the Maury boys and defendant during the time that the latter was in the custody of the former. If the Maurys or Street threatened, or made promises to the defendant in connection with the murder of Ferguson, witness did not know it.

W. S. Fry testified, for the State, that he was town marshal of Denton in January, 1888. Between eleven and twelve o'clock on the night that defendant was put in jail Rufe Street came to witness's gate, called witness and told him that the man who killed Ferguson was up town. Street, who appeared to be very much excited, did not then say that the man was in custody. Witness told Street to go back to town and that he would follow in a few minutes. A few minutes later witness went up town and found Street and the two Maurys with the defendant at Paschal's saloon. The Maurys and defendant came out of the saloon as the witness got to the door. Street remained in the saloon. One of the Maurys had a handcuff on the defendant. Witness opened a conversation with defendant, during which Maury said nothing that witness could remember. Street soon came out of the saloon, and he, the Maurys and witness went to the jail with defendant. Witness remembered no conversation that occurred at the jail. When he met the Maurys and defendant at the saloon, witness asked one of the Maurys: "Is this (referring to defendant) the man?" Maury replied: "Yes; he says he killed Ferguson." Witness put de-

fendant in jail at once, but did not remember that he did or not tell Boyd at the jail that defendant confessed to the killing of deceased.

J. G. Boyd testified that he was jailer of Denton county in January, 1888, when the defendant was put in jail for the murder of Ferguson. Bill Fry, Bill Maury, Rufe Street, and, the witness thought, Riley Maury, brought defendant to the jail a few nights after the assassination of Ferguson. Fry said to witness, referring to defendant, who was handcuffed: "This is the man who killed Ferguson." Riley Maury then, or a few minutes later, told witness that defendant had confessed to killing Ferguson. Witness was unable to say whether or not all of the parties with defendant then went into the jail, but it was his impression that they did. After putting defendant in a cell, the witness went to Sheriff Sparks's boarding house and notified him that the man who killed Ferguson was in jail. The first words spoken by Sparks to defendant were: "Are you the man who killed Ferguson?" Defendant replied: "Yes, sir." Sparks then said: "If you have anything to say about the killing I would like to hear it, but I must warn you that whatever statement you make about it can be used in evidence against you." Witness did not hear what, if any, direct reply defendant made to that warning, but he told Sparks that he entered Ferguson's yard at the north side, and went out at the east side; that he fired through a window with a shotgun and killed Ferguson; that a light was burning in the parlor at the time; that he fired but one shot and immediately climbed the east yard fence and got into the big road; that in going to Ferguson's house he went by Rufe Street's house, but did not find said Street at home; that he went on and met Rufe Street in the road near Rufe's house, when Rufe Street paid him fifty dollars to kill Ferguson. When placed in jail the defendant had on a pair of shoes of unusual size, being eleven or twelve in size, and quite two sizes larger than the shoes worn on this trial by defendant. Defendant took off his coat when he entered his cell, and witness hung it up on the south wall outside of the cages in the corridor. No person handled that coat that night so far as witness knew. No person other than Sheriff Sparks entered the jail that night after witness and the Maurys and Fry left. On the next morning witness and Mr. Mars searched the defendant's coat and in the pocket found a part of the hull of a recently exploded cartridge.

On cross examination, the witness said that while he was searching the person of the defendant in the jail, Fry took Rufe Street's pistol and notified Street that he would also be put in jail. If Street was in the far end of the cell at the time that defendant made the statement to Sparks, he would have been about twenty-five feet distant from Sparks and defendant. Sparks and defendant talked in a somewhat suppressed tone of voice. They might have been heard, but most probably not understood, by a person in the far end of the cell. The witness declared that, in his opinion, it was impossible that the piece of cartridge hull was placed in the defendant's pocket after the coat was hung up in the corridor of the jail. It might have been placed in that pocket by some third person before the defendant was put in jail. The witness considered the defendant to be thoroughly sober when placed in jail, but he thought Bill Maury was drinking a little. Defendant was a man of more than average intelligence. He spoke broken but intelligible English.

John Bacon testified, for the State, that he was in the sleeping car of the train on which the Maury boys and Rufe Street took the defendant from Roanoke to Denton, on the night of January 3, 1888. When the train reached a water tank about two and a half miles from Roanoke, and while it was waiting there for the removal from the track, at a point ahead, of a recent wreck, Rufe Street came into the sleeper and told witness of the assassination of John Ferguson on New Year's night. He also told the witness, the conductor of the sleeping car, and two other gentlemen, that the Dutchman who committed the murder was on the train under arrest. Witness asked him how he knew the man he had was the man who killed Ferguson. He replied that the man was seen going in the direction of Ferguson's house on the fatal evening, with a gun wrapped in a slicker or bundle. Witness asked him who saw the man going toward's Ferguson's house. He replied that a man named Maury and one named Heath saw him. He then detailed what he termed evidence pointing to the guilt of the man he had in charge, and said that he wanted to bring that man into the smoking apartment of the sleeper to be interviewed by the witness and the other gentlemen. In that connection he requested that, when he should bring the man into the said smoking apartment, the witness and the gentlemen with him should tell the man that they were detectives,

and knew all about the killing of Ferguson, and advise him to confess and make a detailed statement about the assassination. The witness declined to have anything to do with the proposed scheme. The train remained some time at the tank, and Street left the sleeper, after remaining in it at least thirty minutes before the train left the tank. Street, who the witness thought was pretty drunk, said that the Dutchman had confessed to the killing of Ferguson.

Dan Griffith testified that he was at the depot in Roanoke when the defendant left on the train for Denton, in the custody of Rufe Street and the two Maurys. During the hour and a half preceding the departure of the train for Denton the witness saw the defendant take two moderate drinks from a bottle furnished by Newt Graham. He could not say that defenant was not sober. Neither he nor Will Maury walked like drunk men. Some men could walk straight when drunk.

J. W. Nichols testified, in substance, that he was at the depot in Roanoke on the night that defendant was taken to Denton by Street and the Maury boys. Bill Maury, whom witness had never seen before, saw witness talking to defendant before the arrival of the train. Induced perhaps by the apparently confidential relations existing between witness and defendant, Bill Maury requested witness to take defendant into a corner of the depot and advise him to confess as a means of securing lighter punishment; to tell him that his punishment would be less severe if he would inculpate his accomplice or accomplices, if he had any, and, if necessary, to frighten him into a confession by telling him that by confessing he would avoid the danger of being mobbed on reaching Denton. Witness took defendant into a corner of the room and had a suppressed private conversation with him, in the course of which he advised defendant as requested by Bill Maury.

W. T. Maury testified, for the State, that, two or three days after the killing of Ferguson, he and his brother Riley Maury and Rufe Street went to the house of Andy Peterson, about a mile and a half northwest from Elizabethtown, and arrested the defendant. From Peterson's they took defendant to Roanoke, reaching Roanoke about dusk. Leaving the defendant in a grocery store in the custody of Rufe Street and Riley Maury, the witness went out to hunt for Med. Snead, the constable. When he and Snead reached the grocery store they found it closed, and ascertained that Riley Maury and Rufe Street had

taken defendant to the depot. They then went to the depot, where they found Riley and Street with the defendant. The witness then proposed to deliver the defendant to Constable Snead, but Street objected. Witness then left defendant in charge of Riley Maury, Rufe Street and Snead at the depot, and went off to put up the horses ridden by him and his party to Peterson's house. He then returned to the depot and remained there, with the others, until thirty minutes after nine o'clock, when the train arrived. He and his party, with defendant, boarded the train and went to Denton that night. While at the depot the witness saw the witness John Nichols. The conversation between witness and Nichols, detailed by Nichols in his testimony, was a purely imaginary one on the part of Mr. Nichols. Witness did not request Nichols to talk to defendant about the killing of Ferguson or about any other subject. He did not ask Nichols to advise defendant to confess to the killing of deceased, nor to frighten him by suggesting mob violence on reaching Denton.

On his cross examination the witness said that, while on the train, he remarked to the defendant that it might be better for him to make a statement, but he did not take the defendant into a water closet on the train, close the water closet door, and tell him that if he, defendant, would make a confession he, witness, would let him go back to Roanoke. Witness took the defendant to the water closet once between Roanoke and Denton, but did not himself go into the water closet, but stood at the door outside. Witness did not ask Rufe Street, while en route from Roanoke to Denton, to go through the train and try to find somebody to personate a detective and extort a confession from defendant. None of the parties, so far as the witness knew, were drunk on the day defendant was arrested. Witness and his party got at Roanoke the only whisky they had until they reached Denton that night. Witness drank no whisky between Roanoke and Peterson's house, and he did not see either Street or Riley take a drink. They took their first drink near old Elizabethtown on their return from Peterson's, and the second before they reached Roanoke. The defendant took a moderate drink on each of these occasions. The witness was at deceased's house on the Tuesday morning after the killing, and met old man Ferguson, who told him that he would pay him, witness, well to work up this case. From deceased's house witness went to the grave yard near Shiloh church, where Rufe

Street was at work, and asked Street if he would go with him to investigate as to defendant's connection with the killing. Rufe asked in reply if there was "any money in it," but witness did not tell him of old man Ferguson's proposition to pay well for the work.

On re-examination this witness said that when he got to deceased's house he asked old man Ferguson if he had yet discovered any clues to the assassin. Mr. Ferguson replied that he had not, when witness told him that he had understood that Rufe Street met one of the Zwickers on the fatal evening, and that his, witness's, brother and two sisters on the same evening saw a tramp with a budget on his back, traveling towards the road that led from Bond's house to deceased's house, and that John Wakefield was said to have seen a similar tramp on the public road on the fatal evening. Witness also showed Mr. Ferguson a stick measure of some tracks he had seen in the road, and then insisted that Mr. Ferguson should send to Lewisville for Constable Gus Hall to trail the tramp. Mr. Ferguson replied that he was satisfied Hall was then in Denton, and asked witness to do the best he could in following up the supposed clues. Witness then said if he could he would get Rufe Street to go with him to identify the man he met on Sunday evening, and would then put Constable Snead of Roanoke on the case. Mr. Ferguson replied: "Do so, and I will pay you well for it." Defendant talked intelligible English, and the witness understood him without difficulty.

The testimony of the preceding witnesses Sparks, Fry, Boyd, Bacon, Griffith, Nichols and W. T. Maury, was delivered to the court in the retirement of the jury, as the predicate (contested by the defense) upon which the confession of the defendant was to be admitted or rejected—the defendant objecting to the confession that it was improperly induced while the defendant was drunk. The court held the predicate sufficient and, upon the return of the jury to the box, the witnesses Sparks and Boyd testified before them substantially as they did before the court.

Mrs. Ella Ferguson testified, for the State, that she was the widow of the deceased. Deceased died about two o'clock on the morning of January 2, 1888, from the effect of a gun shot wound he received about half-past seven o'clock on the night before. The witness was present when deceased received his death wound. He was lying on a couch in the northwest

corner of the parlor of his house, his face looking east. The witness and her two daughters, Mr. Sarver, who had since married one of witness's said daughters, and old Mr. Zwicker, an uncle of the defendant, were in the parlor when the fatal shot was fired. That shot was fired through the bay window in the east end of the parlor, the half of one of the blinds to that window being open. The report of the gun confused the witness at first. When she recovered she saw the other parties kneeling over deceased, and the blood flowing freely from deceased's face. A doctor was sent for immediately. An organ stool stood in the room between the bay window and the couch on which deceased was lying. A buck shot struck that stool. One buck shot struck the hand of the deceased, and another entered his head at the ear. The last mentioned shot caused Mr. Ferguson's death about two o'clock on the next morning. Witness's oldest daughter, now Mrs. Sarver, was sitting near the deceased when the fatal shot was fired. Witness was sitting in the center of the room. Her youngest daughter was sitting near the organ. Mr. Sarver was sitting near the couch, and Mr. Zwicker, the uncle of defendant, was sitting near the bay window. Old man Zwicker had lived at the witness's house for several years. Otto Zwicker, defendant's brother, had once lived with deceased, but witness had never seen the defendant until she saw him in custody for killing the deceased.

Mrs. Ella Sarver, the daughter of the deceased and the preceding witness, testified, for the State, substantially as did her mother, adding that, besides the bullet holes mentioned by her mother, she saw others in the end of the couch and in the wall behind it. The shot broke the window and scattered glass over the room and set the window curtain on fire. Old Mr. Zwicker extinguished the burning curtains. The shooting occurred about half past seven o'clock on Sunday evening, January 1, 1888, when the family, as was its custom on Sundays, had assembled in the parlor. Witness's mother, at the time of the shooting, was reading aloud, and the others present were listening.

W. T. Maury, recalled by the State, testified that he heard of the killing on the day after it occurred. On the next morning, Tuesday, he went to Bond's house to learn from Bond, if he could, the exact hour when his, witness's, brother and sisters reached Bond's house on the preceding Sunday evening, and to ask Bond if a tramp applied at his house for food or lodging on

that night. He found and measured a large foot track on the road leading north from Bond's house to the road running east by deceased's house. Witness went from Bond's house to the house of deceased, and thence to Rufe Street's house. He found a large track near Street's house, to which he applied the measure taken of the track near Bond's house, and found them to correspond exactly. He later, when en route to Peterson's house, found the same track on the road to Roanoke. at a point about three and a half miles distant from Rufe Street's house. Witness and his brother and Street arrested defendant at Peterson's house, near Elizabethtown. They first found him at the shop with a bucket of paint, wearing a shoe and a slipper. They took him to the field where his brother Otto was, and Street the second time identified the defendant as the man he met and talked with on the previous Sunday evening. Witness then had defendant remove the slipper, and closely examined that foot, but found no bruise on it. It did not show to be hurt at all. He then applied to the foot of Otto Zwicker the measure he had taken of the tracks before mentioned, and found it not to correspond. He then applied it to the feet of defendant, and found it to correspond perfectly. On getting back to Peterson's house the defendant went into said house and got his other shoe and changed hats. At Roanoke defendant removed his slipper and put on his shoe. When witness last saw defendant's coat and shoes they were in the jail at Denton. The shoes were of extraordinary size, being twelve or thirteen inches long. The track nearest Ferguson's house, measured by witness, was about a mile and a half distant.

On his cross examination, the witness denied the testimony of Rufe Street to the effect that he, Street, on Monday, in Kincaid's wagon yard in Denton, told him, witness, that he, Street, saw the defendant on Sunday evening near his, Street's, house. The first whisky drunk by witness, his brother Riley or Rufe Street on Tuesday was on their return from Peterson's to Roanoke. Witness and defendant took two small drinks between Peterson's and Roanoke. Defendant took another small drink in Roanoke, but if he took any more before being placed in jail, witness did not know it. He did not know how many drinks in all were taken by Street and Riley Maury. Witness denied that while at the depot at Roanoake he got defendant's shoe, took it out, and came back with a stick measure and remarked that the measure of the tracks he had taken

corresponded with the shoe. He denied that, at the same time, he said that he had counted the nails in the shoe and found them to correspond with nail impressions in the tracks he had measured. Neither the witness nor defendant drank any whisky or other liquor after reaching Denton. Witness and deceased had a "little fuss" once in Louisville, but were on friendly terms when deceased was killed. Witness knew O. J. Massey, who lived south of deceased's place. Massey never offered witness his farm to kill Ferguson.

J. R. Maury, for the State, testified substantially as did his brother as to what transpired from the time they started to Peterson's house to arrest defendant, until defendant was placed in the Denton jail on the same night. He testified also that he made a separate measurement of the large shoe tracks in the road near Bond's house, near Street's house, and at a point about a mile and a half from deceased's house, being all of the tracks testified about by W. T. Maury except the one on the Roanoke road, which witness did not measure. The tracks measured by witness corresponded and looked to have been made by the same boot or shoe. Witness remembered seeing John Nichols at the depot in Roanoke. He said nothing to Nichols that night about having counted the tack impressions in the tracks measured by him in the morning. He did not leave the depot building with one of defendant's shoes and return with it and a stick measure, and tell Nichols or any body else that the shoe corresponded with the measure of the tracks and that the tacks in the heel and toe corresponded in number with the tack impressions in the tracks. Nichols did not, in the presence of witness, remove some mud from the heel of defendant's shoe, count the tacks, and say to witness: "Your tale won't do. Here are seven more tacks in the heel than you say were in the track." Witness knew O. J. Massey, who for a time was in partnership with deceased in the patent right business. Witness worked for them awhile in 1887, and during that year traveled in a buggy with Massey through Bowie county, Texas. While in Bowie county, Massey told witness that he would give witness all he owned to put deceased out of existence. Notwithstanding the proposition, witness continued to work for Massey until they got back to Denton, when he told deceased of Massey's proposition, quit work, and made affidavit of Massey's proposition before lawyer Copley.

T. E. Ball testified, for the State, that to his knowledge, de-

fendant, on September 27, 1887, owned a number ten breach loading double barreled shot gun.   T. A. Lee testified that on December 23, 1887, he delivered to the defendant a quantity of number ten cartridge caps which he, defendant, had previously ordered of him—witness being a merchant in Elizabethtown, Denton county.

J. G. Mars testified that, on the morning after the fatal night, he and one of the deputy sheriffs searched the coat of the defendant, and in one of the pockets found the part of a number ten shot gun cartridge hull now exhibited in evidence. Powder burn showed that it had been recently exploded.   The said hull, when intact, could be loaded with any kind of shot.

Pat Street testified, for the State, that his brother Rufe came to his house early in the afternoon of the fatal Sunday, to bring a man whom the witness had hired to work on his place.   Witness's shot gun was at his, witness's, house, all of the fatal night.   The road from witness's house to Rufe Street's house passed by the house of John Wakefield.

Deputy County Clerk Zumwalt testified, for the State, that at the time deceased was assassinated a suit between the Zwickers and Peterson and the Fergusons was pending in the county court.   Defendant was a party to that suit.

J. B. Walker testified, for the State, that his law firm was assisting in the prosecution of this case under employment of Mrs. Ferguson, the widow of deceased.   O. J. Massey was in Denton a few days before this trial, but was now traveling in the patent right business.   The State closed.

John Bacon was the defendant's first witness.   He testified substantially as he did before the court during the retirement of the jury, adding that he did not see the defendant on the train; did not attempt to get defendant to confess, and saw nobody else make such an attempt.   In his opinion Rufe Street was drunk on that night.

Gus Hall, constable of precinct No. 3 of Denton county, testified, for the defense, that he went to the house of the deceased on the night of the shooting, and soon after it occurred, remained an hour or two and then went to Roanoke.   The moon rose on that night between eight and nine o'clock.   At a point on the road between deceased's house and Roanoke, and about three miles from deceased's house, the witness, by the light of the moon, saw the tracks of a horse or horses which indicated that they were made by a horse or horses running, or at least

traveling fast. From Roanoke witness went to Peterson's house, his purpose being to find the Zwickers—Otto in particular—with the view of discovering a clue to the assassin. He reached Peterson's about eight o'clock on the next morning. He found Peterson about the place, defendant at or near the paint shop, and Otto in the field about a mile off. He reported to them the assassination of Ferguson. Witness observed that one of the defendant's feet was very purple and apparently was severely bruised. He said that a wagon wheel fell on it on the previous Saturday. Witness could not say how defendant's foot looked on the next (Tuesday) morning. He did not get off his horse to examine the horse tracks he saw on the road. He last saw those tracks about a mile from Walnut Grove school house.

Rufus Street testified, for the defense, that he met and talked with defendant, as he testified for the State, on the evening of the fatal Sunday, but he did not then nor at any other time pay or promise to pay defendant fifty dollars, or any other sum, to kill Ferguson.

John Nichols was re-introduced by the defense and reiterated his testimony to the effect that, at the request of Bill Maury, he took the defendant into the corner of the depot at Roanoke on Tuesday night, and advised him to confess to the killing of Ferguson, as a means of securing lighter punishment, and avoiding attack by a mob, etc. One of the Maury boys took one of the defendant's shoes out of the depot, and on returning applied a measure to it. One of them also remarked that the number of tacks in the shoe corresponded with a specified number of tack impressions in the tracks he had measured. Thereupon witness removed some mud from the heel of one of defendant's shoes, counted the tacks and found them to outnumber by seven the number of impressions in the tracks as stated by Maury. Newt Graham was at the depot, drunk, and Rufe Street was there with a pint bottle of whisky, with which, he said, he arrested the defendant. Witness gave defendant a drink of whisky at the said depot on that night, and saw Graham give him another.

Cross examined, the witness said that he had often testified as a witness in criminal cases, and had himself been charged with criminal offenses. He was charged once with fighting, once with carrying a pistol, and twice with theft. Andy Peterson came to witness's house a short while before this

trial, and talked some time with witness, but paid him no money. Witness testified on the previous trial of this case, but said nothing about Bill Maury getting him to attempt to extort a confession from defendant. He was not interrogated about that matter. The theft cases against witness, mentioned above, were dismissed and never tried.

Fred Peterson testified, for the defense, that he went to Elizabethtown on the evening of the fatal Sunday, and in going to that town passed by the place where defendant lived,—at Andy Peterson's. It was about three quarters of an hour before sundown when witness passed Andy Peterson's house. From a distance of about one hundred or one hundred and twenty yards, the witness saw the defendant standing near the paint shop with his foot resting on something. Within a moment or two the defendant limped into the shop. The evidence shows that Andy Peterson's house was several miles beyond both Roanake and Elizabethtown from deceased's house, and that Roanoke is sixteen miles distant from Elizabethtown. The defense closed.

To contradict the last witness, the State introduced Parker Terrell, who testified that he was at Andy Peterson's house about four o'clock on the evening of the fatal Sunday when Andy Peterson and Otto Zwicker reached that house with a small bunch of yearlings. No person came out of that house to open the gate for the yearlings, and witness while there saw no person other than Andy Peterson and Otto Zwicker.

No brief for the appellant.

*W. L. Davidson,* Assistant Attorney General, for the State.

HURT, JUDGE. Appellant was placed upon trial under an indictment for murder in the usual form. The jury returned into court this verdict: "We, the jury, find the defendant guilty as charged in the indictment, and fix his punishment at confinement in the penitentiary for the period of his natural life." This verdict was received by the court, and the jury discharged.

Our Assistant Attorney General confesses error, because article 607 of the Penal Code provides that when a party is convicted of murder the jury *shall* specify in their verdict the degree of that offense of which they convict the defendant. This the verdict fails to do. That this is essential to a valid verdict

in convictions for murder is too well settled to require citation of authorities. For this defect in the verdict the judgment must be reversed and the cause remanded for another trial.

But the Assistant Attorney General suggests the propriety of the court passing upon two questions presented by the record. First. The court charged the jury that "the defendant is presumed by the law to be innocent until his guilt is established by competent evidence to the satisfaction of the jury beyond a reasonable doubt, and if you have on your minds, arising from the evidence, a reasonable doubt as to the guilt of the defendant, you will find him not guilty."

Counsel for the defense objected to this charge upon two grounds: First. Because it requires either the State or the defendant to introduce affirmative evidence of defendant's innocence. Second. Because a reasonable doubt may arise from a want of evidence as well as from evidence introduced before the jury.

We have carefully examined the opinions of this court bearing upon this question, but find no judgments of reversal because of such a charge. The cases of Smith v. The State, 9 Texas Ct. App., 150; Blocker v. The State, Id., 279, and Wallace v. The State, Id., 299, were reversed because the charge required the jury to believe the accused innocent.

The case of Massey v. The State, 1 Texas Ct. App., 563, may be relied upon in support of the objections of appellant. In that case the court instructed the jury: "If you have a reasonable doubt as to the defendant's guilt, he is entitled to an acquittal; but it must be a reasonable doubt arising from and growing out of the evidence before you, and not an unreasonable doubt not growing out of the evidence." Upon this charge Presiding Judge Ector remarked: "A reasonable doubt, such as would entitle the defendant to an acquittal, need not necessarily arise out of the testimony; it may be the result of a want of testimony sufficient to satisfy the mind." The judge advises all trial judges, in their charges upon this subject, to follow the exact language of the statute and not to attempt any explanation. The judgment in that case was not reversed because of the charge commented upon. It will be seen that the charge given in the Massey case and the one under discussion are not alike in form or substance.

Back now to the first objection. This charge does not require the introduction of exculpatory evidence, nor is it calculated

to impress the jury that the guilt of the accused is established beyond a reasonable doubt because there is no exculpatory evidence introduced before them. Nor does it, as was done in the cases referred to in 9 Texas Court of Appeals, place in the scales the guilt and innocence of the accused.

Second. It is true that a reasonable doubt may arise from a want of sufficient criminative facts to establish guilt, and it is contended that the jury may have construed the charge as requiring them to reach the conclusion that the accused was guilty beyond a reasonable doubt, because there was no evidence of innocence, when, in fact, the criminative facts were not sufficient—did not have such probative force. We do not think the charge calculated to have such effect.

A is placed on trial for murder; there is no evidence against him. The court instructs the jury that the defendant is presumed by the law to be innocent until his guilt is established by competent evidence to their satisfaction beyond a reasonable doubt. In this the jury are very clearly told that as defendant is presumed innocent, his guilt must be established—proved by competent evidence—evidence which establishes his guilt—criminative evidence. To what certainty? *To their satisfaction beyond a reasonable doubt.* Taking this charge as a whole, no one of ordinary sense could infer from it that he could reach the conclusion that defendant was guilty beyond a reasonable doubt, because there was no evidence of his innocence. We hold that the judgment should not be reversed because of the charge upon reasonable doubt, but would here again implore the trial judges to follow the words of the statute. (Code Crim. Proc., art. 727.)

The State introduced in evidence the confessions of appellant. There was proof that he had taken four or five drinks of whisky within six or eight hours before making the confessions. Counsel for appellant requested the court to instruct the jury "that if you find and believe from the evidence that defendant was so intoxicated at the time he made the confession as not to be able to understand what he was doing or saying, then you will not regard such confession as evidence against defendant." This was refused and exceptions were reserved. There is no proof that appellant was drunk at the time the confession was made, except inference drawn from the fact of his taking the four or five drinks above referred to. On the other hand, the testimony of the sheriff places this

matter beyond debate—showing clearly that he was not drunk. There was no error in refusing the charge.

But let us suppose that the evidence presented a case in which there was doubt as to whether the accused was mentally capable of understanding what he was doing or saying, because of drunkenness, and that such a charge should be requested and refused, would this be error? We have not had the question before us, but the writer is of the opinion that it would be. But this question is not here decided.

Because the verdict does not specify the degree of murder found, as required by the statute, the judgment is reversed and the cause remanded for another trial.

<em>Reversed and remanded.</em>