## FITTS *v.* STATE.

### (*Nashville.* March 16, 1899.)

1. CRIMINAL PRACTICE. *Effect of void verdict.*

   A verdict fixing a punishment in excess of the maximum prescribed by statute, and for that reason set aside as a nullity, cannot be successfully interposed to prevent another trial and further prosecution of the case. (*Post, pp. 142, 143.*)

   Cases cited and approved: Ragsdale *v.* State, 10 Lea, 671; Murphy v. State, 7 Cold., 516.

2. EVIDENCE. *Of defendant's statements after homicide admissible, when.*

   Declarations by defendant twenty or thirty minutes after the homicide, warning the witness not to go to his store, at which was located a telephone, affording the only method of communicating with the county seat, informing him that he must be careful what he testified to, and deriding the wife and daughter of deceased, who came along crying and moaning, are admissible against him, as tending to show an effort to suppress evidence, intimidate a witness, and to cut off communication with the county seat, and also for the purpose of showing malice. (*Post, pp. 146, 147.*)

---

FROM SUMNER.

---

Appeal in error from Criminal Court of Sumner County. A. H. MUNFORD, J.

---

Fitts *v.* State.

---

J. J. TURNER for Fitts.

Attorney-general PICKLE and W. C. DISMUKES for State.

McALISTER, J.   The plaintiff in error, Sam Fitts, was convicted by a jury in the Circuit Court of Sumner County of the murder of one John Perry, and sentenced to the State prison for a term of fifteen years.   The prisoner has appealed in error.

It appears from the record that on a former trial the prisoner was convicted of murder in the second degree, and his term of imprisonment fixed at twenty-one years in the penitentiary.   The maximum punishment for murder in the second degree being fixed by statute at twenty years imprisonment, the verdict of the jury fixing the punishment at twenty-one years was a nullity, and a new trial was therefore granted.

It is conceded that the jury was led into the error by an inadvertence on the part of the trial Judge in defining the punishment for murder in the second degree.   Counsel for the prisoner then interposed a plea of *autre fois convict*, relying upon the former prosecution and verdict in bar of a second trial.   On motion of the District Attorney this plea was stricken from the files, to which action of the Court counsel for the prisoner excepted.

The former verdict was unwarranted, and, being a nullity, no valid judgment could be pronounced upon it.   It was therefore no bar to a second pros-

ecution. *Ragsdale* v. *State*, 10 Lea; *Murphy* v. *State*, 7 Cold.

The killing occurred in the village of Westmoreland, in Sumner County, on Christmas day, 1897. The prisoner lived about a mile from the village. He testified that on the morning of that day he had been informed that his nephew, one Charles Tyree, had been assaulted in Westmoreland by the Perrys, and that he was advised to go there and look after him; that he immediately repaired to the village, where he found his nephew engaged in a fight, and that when he endeavored to take his nephew out of town, he was assaulted with a stick by one Bob Aiken, a friend and relative of the Perrys.

The prisoner states that he repelled this assault, and took his nephew home. Prisoner further testified that during the afternoon of the same day, while at home, he was notified that his brother, Matt Fitts, was about to be killed in the village, and that he had better go and look after him. On reaching the village he claims to have found his brother in a fight with the Perrys, and that one of the Perrys was after him with a brick. Defendant claims that he started to take his brother home, and when near the depot he met Sam Perry, a son of John Perry, the deceased, with a double-barreled shotgun, who inquired of defendant what he was doing there. Defendant replied that he was taking his brother home. Thereupon Sam Perry passed

into the sitting room of the depot, and, as he did so, his father, John Perry, the deceased, walked rapidly out of the door towards the defendant and rolled up his sleeves. Defendant said: "Don't come any further, don't hit me!" But at that moment deceased drew a knife, and still advanced towards him. Defendant states that he backed across the platform of the depot and against the train that had just passed into the depot. The deceased, says the defendant, still advanced towards him, and when within three or four feet raised his hand to strike him with his knife, and thereupon the prisoner says he drew his pistol and shot deceased. This is the substance of defendant's testimony, and, if it is to be credited, it makes out a case of self-defense in the fullest and most technical sense. But, unfortunately for the defendant, he is not corroborated in his account of the tragedy by a single witness. On the contrary, nine witnesses introduced by the State make out a case of the most unprovoked and unjustifiable homicide.

According to these witnesses, about four o'clock in the afternoon of Christmas day, Matt Fitts, a brother of the prisoner, and the Aiken boys became involved in a difficulty, but John Perry, the deceased, had no connection with it whatever.

The prisoner, Sam Fitts, was first seen coming down the railroad, and, meeting Bob Aiken, cursed him, and asked him "what he had to do with it." Aiken replied, "I have nothing to do with it,"

whereupon Fitts snapped his pistol at him, and Aiken ran. Defendant next accosted West Perry, addressing the same remark to him, and, receiving the same response, pushed Perry out of the way, cursing him. Defendant then started towards the depot, when he met Sam Perry with a double-barreled shotgun. Defendant asked, with an oath, "What have you got to do with it?" and "What are you doing with that gun?" Sam Perry replied, "I have nothing to do with it, Uncle Sam, and the gun is not loaded," and showed defendant the gun was unloaded. Sam Perry turned and walked back to the depot, and, going in, shut the door behind him. About this time, John Perry, the deceased, came out of the depot, and defendant immediately accosted him with the query, "What in the hell have you got to do with it, you son of a bitch?" and, addressing his brother, Matt, who had a stick in his hand, said, "Hit him, God damn him!" John Perry remarked, "I had nothing to do with it, and don't you call me a son of a bitch," at same time raising his hand. Defendant said, "You are a damned liar," pulled his pistol, and, holding it in his hands, shot John Perry in the breast, killing him almost instantly. The witnesses for the State testify that deceased had nothing in his hands at the time he was shot, and made no attempt to strike defendant. Five or six witnesses swear to this fact. Another witness for the State testifies that when defendant asked deceased what he had to do with it,

he replied, "I had nothing to do with it; I am for peace." These facts amply support a conviction for murder in the second degree.

Error is assigned upon the action of the trial Judge in not excluding the testimony of the witness, C. A. Whiteside. This witness testified that about twenty or thirty minutes after the killing he had started home with his wife; that defendant followed them into the house of witness, and said, viz.: "I have had it in my mind to kill you for some time, and if you take any interest in Perry I will kill you." Defendant warned witness to stay in his house, and not go to his store, where the telephone was located, the only method of communicating with Gallatin. "Defendant also said I must be mighty particular what I testified, 'that he was a bad man, and expected to be sent up six or seven years for killing old man Perry, and when he got out he would settle with me.' About this time the wife and daughter of deceased came along crying and moaning. Defendant saw and heard them, and said, 'Go on moaning, God damn you! I have killed old John Perry, and I intend to kill Sam Perry, too.' "

It is earnestly insisted by learned counsel that these alleged statements, made by the prisoner twenty or thirty minutes after the killing, are clearly incompetent. We do not think so. They are plainly admissible to show an effort on the part of prisoner to suppress evidence and to intimidate a witness, as

Fitts *v.* State.

well as to cut off communication with Gallatin, the county seat. They are also competent as illustrating the malice of defendant.

Several requests were submitted on behalf of the prisoner, which were refused by the Circuit Judge. We find no error in the action of the Court, and the judgment is affirmed.