STATE OF IOWA, Appellee, v. WILLIAM SAYLES, Appellant.

**HOMICIDE:** First Degree Murder—Corpus Delicti—Evidence. Evi-
1    dence reviewed, and *held* sufficient to show that a blow over the larynx caused or hastened the death of deceased, and that defendant struck the blow.

**CRIMINAL LAW:** Evidence—Res Gestae—Threats—Statements by
2    **Accused.** Statements by the accused in the nature of threats, made immediately following an altercation with deceased, and tending to show the feeling entertained by accused towards deceased, are admissible as part of the *res gestae.*

PRINCIPLE APPLIED: Accused struck deceased. He then struck at the brother of deceased. The brother knocked the accused to the ground and held him until a policeman arrived, a few seconds later. The brother said that the accused might get up if he would behave himself. The accused then said: "If you let me up, I will clean the whole Runyan family." *Held* admissible as part of the *res gestae.*

**APPEAL AND ERROR:** Review—Exclusion of Question—Necessity
3    **to Show Prejudice.** Error may not be predicated on the exclusion of questions which in no manner suggest the answers expected, especially when the court indicates to counsel that it does not understand the trend of the questions and counsel fails to enlighten the court.

**CRIMINAL LAW:** Evidence—Hypothetical Question—Recital of
4    **Facts—Basis in Evidence..** The facts recited in a hypothetical question *must be such as the evidence tends to establish.*

PRINCIPLE APPLIED: Trial for murder. Deceased died, on the theory of the State, from suffocation caused by an injury to the larynx. There was evidence that *if* food regurgitated from the stomach to the mouth and then fell into the larynx because the epiglottis failed to perform its function, strangulation might result;

but there was no evidence whatever that there was or had been any foreign matter in the larynx. *Held,* the recital, in a hypothetical question, ·of the· assumed fact that some foreign substance was in the larynx, rendered the question improper.

**HOMICIDE:  Trial—Submission of Offenses—First Degree Murder—-**
5 **Insufficiency of Evidence to Sustain—Effect.** The submission to the jury of the question of first degree murder (properly charged in the indictment) is not error when the record contains *some* evidence fairly tending to show guilt thereof, even though, had the jury returned a verdict of guilt of· such degree, the court would have been compelled to set it aside as without sufficient support in the evidence.

**HOMICIDE:  Judgment—Murder—Indeterminate Sentence—Correc-**
6 **tion on Appeal.** A judgment ''for an indeterminate period'' for murder is improper, the Indeterminate Sentence Act expressly excepting murder from its operation. In such a case, on affirmance on appeal of a .verdict of guilt, the judgment will be so corrected as to conform to that which the lower court· should have entered. (Sec. 5462, Code, 1897.)

*Appeal from Pottawattamie District Court.—*E.·B. WOODRUFF, Judge.

TUESDAY, JANUARY 11, 1916.

THE defendant, having been convicted of murder in the second degree, appeals.—*Affirmed.*

*H. J. Chambers,* for appellant.

*George Cosson,* Attorney General, *C. E. Swanson,* County Attorney, for appellee.

LADD, J.—I. The accused struck John G. Runyan with his fist, but one blow. This happened shortly before nine o'clock of May 7, 1914, and Runyan died, apparently from suffoc-

1. HOMICIDE: first
degree murder:
*corpus delicti:*
evidence.

ation, about fifteen minutes after eleven o'clock the same evening. Appellant contends (1) that the evidence was not such as to warrant his conviction and (2) that there was no evidence of murder in the first degree; and, for this reason, the court

erred in submitting to the jury the question as to whether he
was guilty thereof.

Was death caused, or at least hastened, by a blow over
the larnyx? At the autopsy, no external marks were dis-
covered on the body, except "a slight discoloration of the skin
over the voice box and wind pipe". An .autopsy was held
and, among other things, Dr. Treynor testified:

"We cut down the larynx and found tissues of larynx
discolored and bruised. Removed the larynx and found the
bruises extended through the larynx, and there was injury
to mucus lining, and blood clot engaged in mucus lining of
larynx. The tissues surrounding larynx permeated with
blood, fluid and air. In my opinion, Mr. Runyan's death was
due to œdema and emphysema of the larynx and tissues of
the throat. Death would result from suffocation. Œdema
and emphysema caused by contusion of tissues so that little
capillary blood vessels were ruptured and would leave a
bloody part of the fluid in tissues, producing watery condi-
tion. An entrance of air from larynx would infiltrate tissues
with air; it would be a gradual accumulation of water and
fluid. Death would not be immediate; time would depend on
extent of contusions. If there were a great many small capil-
lary blood vessels broken, the infiltration of blood into the
tissues would be more rapid than if more limited. It would
require considerable force to produce such condition, in my
judgment. A thickening of the mitral valve of the heart was
discovered, and this would somewhat impair its use. We
found acute dilation of the right heart. There was a leaky
condition of the right heart; between the right auricle and
ventricle there was regurgitation of blood from ventricle to
auricle."

The physician stated further that many die because of
this condition and often quickly. and that, owing to this con-
dition, a person would be likely to die more quickly from
suffocation. "Death from dilation of the heart leaves discol-

oration of the skin that you see in any condition of suffocation from non-aeration of the blood.''

The testimony of Dr. Hennessy was substantially the same, he adding that ''the lungs seemed distended with air and of darker color than ordinarily'' and that there was no external evidence of death from dilation of the heart. ''Whenever there is cessation of circulation, the blood, not being oxygenized, turns purple, manifests itself in purple or bluish color on surface, the same in dilation as in strangulation.''

From this evidence, the jury might have inferred that death resulted from the application of force, as by a blow over the larynx. Was such a blow struck by the accused? A messenger boy had left his bicycle at the corner of a restaurant in Council Bluffs. Defendant came along with a jug and took the wheel with him to the other corner or beyond, when he was seen by the deceased, John Runyan, who stopped him, inquiring what he was going to do with the wheel. Defendant responded that he was taking it for fun, or for a joke, and was going to put it around the corner of the restaurant. About this time, several small boys came up. Runyan asked one of them if it was his wheel, saying that he had stopped Sayles from taking it, when the latter repeated, in substance, that he had taken the wheel only as a joke. At. Runyan's direction, some of the boys notified the owner, and he came for the wheel. After some further talk, Sayles started for home, saying that he would be back again, and returned, after a few minutes, with Lyons. Runyan seems to have repeated the charge several times, and Sayles as often denied it. Sayles then started away, whereupon Runyan asked him if he was scared. He returned again, when Runyan asked him if he knew his brother Fred; and, as Sayles said he did, sent for him. When he came, Fred said he did not know Sayles. The latter remarked, ''You can get acquainted with me,'' and, removing his coat, struck deceased. A cigar fell from his mouth, and, as he stooped to get it, he staggered backward. Sayles then struck at Fred Runyan, who dodged the blow,

and then knocked him down, and, after being on him a short time, offered to let him up if he would behave himself. Defendant responded, "If you let me up, I will clean the whole Runyan family", and denounced him with epithets. One witness testified that defendant struck deceased in the chest; five, merely that he struck the deceased, but did not describe where. After the trouble, deceased went to bed in the bunk house for train crews near the roundhouse of a railway company, by which he was employed. He was next seen fifteen or twenty minutes after eleven o'clock in the evening, coming from the water cooler in the roundhouse, "choking and pulling at his throat", and he could not talk, and died in a few minutes.

From this evidence, the jury might have inferred that the only violence done deceased was the blow of defendant; that this was on the neck over the larynx; and that, by said blow, death was caused or hastened; and therefore, that the defendant was responsible for the death of the deceased. True, the boy Withrow testified that defendant struck deceased in the chest. A witness might easily be mistaken as to the place of contact, especially where the principals are in close proximity. Much necessarily depends upon relative positions and the matter of attention. The other five witnesses did not undertake to say where deceased was hit. The evidence fairly excludes the inference that he was injured subsequently. There was no mark on his person other than over his larynx, and there some violence, as a blow, had been applied. From this evidence, the jury might have inferred that defendant's blow was on the neck, instead of chest, and caused death.

II. It will be recalled that, immediately after striking deceased, defendant struck at Fred Runyan and was by the latter knocked down; and when defendant was on the ground,

2. CRIMINAL LAW: evidence: *res gestae:* threats: statements by accused. a policeman came up, who was asked on the witness stand, "What was he talking about?" and answered that, upon his arrival, Fred

Runyan said to Sayles that, if he would behave himself, he might get up, to which Sayles replied, "If you let me up, I will clean the whole Runyan family." Defendant moved to strike the answer as irrelevant and concerning a transaction had "between the witness and the defendant, and not the decedent in the case". It was immediately connected with what had preceded and but a few seconds thereafter, and clearly was a part of the *res gestae,* tending to show the feeling he entertained towards deceased in what he had done. *State v. Gainor,* 84 Iowa 209; *State v. Jones,* 64 Iowa 349; 21 Cyc., 937.

III. One of the errors assigned relates to the examination of Dr. Hennessy:

"Q. You and Dr. Treynor and the coroner talked there about sending that brain to Omaha for further examination, did you? A. Yes. Q. Did you not advise and Dr. Treynor advise that that be sent? A. We thought it would be a good thing for them to get some fellow to examine that brain. Q. Advised that it be sent? A. Yes. Q. What was your reason for having it examined further? (An objection as incompetent, immaterial, and irrelevant was sustained.) Q. Did you and Dr. Treynor have any given purpose in your suggesting that this brain be sent to Omaha, did you have any given purpose in doing that? (A like objection was sustained.)

3. APPEAL AND ERROR: review: exclusion of question: necessity to show prejudice.

"The Court: I don't just see the force of that question.

"Mr. Chambers: I know, if your Honor please, I want to get further if I can, I think I am entitled to it, and I want to make the record.

"Q. Did you have any express purpose there, you and Dr. Treynor, in suggesting that this brain be sent to Omaha?"

The same objection, with the addition that a conclusion merely was called for, was sustained. Both physicians had testified that the brain appeared to be normal, and the inquiry might well have been allowed, in testing the credibility of such testimony. But though advised that the court did not

catch the trend of the inquiry, counsel for defendant gave no indication of what he sought and has not in his brief claimed the object of the inquiry as above suggested. Moreover, the record contains not the slightest intimation of the answer which might have been anticipated, and it is well settled that, in these circumstances, error cannot be predicated on the ruling by which some kind of an answer merely was excluded. *American Express Co. v. Des Moines National Bank,*—Iowa—(pending on rehearing).

IV. After explaining that regurgitation from the stomach might throw food and other matter therefrom to the mouth, and that, should the epiglottis (covering the larynx) fail to perform its function and the food or foreign matter fall back into the larynx, strangulation might be caused thereby, Dr. Bellinger was asked:

4. CRIMINAL LAW: evidence: hypothetical question: recital of facts: basis in evidence.

"Q. Now supposing a person has a leaky heart, where there is a thickening of the walls of the left ventricle, and some dilation of the heart, where the mitral valve is thick and defective, and suppose severe strangulation and choking from some foreign matter in the windpipe, such as might occur from food or acid from the stomach, what is the fact as to whether death might result to the person, arising from the defective condition of the heart, taken in connection with the strangulation?"

This was objected to because of containing matter not shown in the testimony,—i. e., that the choking or strangulation was from some foreign matter in the windpipe,—and the objection sustained. The facts recited in a hypothetical question must be such as the evidence tends to establish. *Pierson v. Chicago, G. W. R. Co.,* 116 Iowa 601. Those not having a basis of support in the testimony should be excluded; for, if retained, the answer would not be of any assistance in ascertaining the truth. From a recital of facts having such basis, an expert may state in what different ways, if there is more than one, the result might have happened. For instance,

appellant might have inquired whether death might not, under the facts disclosed, have been caused by some foreign matter in the larynx, but he could not assume that it was there, in the absence of any evidence so showing. The ruling by which objection was sustained to the hypothetical question, as containing facts tending to support which there was no evidence, is approved.

V. Defendant excepted to the paragraphs of the charge submitting whether he was guilty of murder in the first degree, for that, as is contended, the evidence was insufficient to warrant such submission. That he struck

5. HOMICIDE: trial: submission of offenses: first degree murder: insufficiency of evidence to sustain: effect.

deceased is undisputed. The repeated accusations are shown to have angered him, and the refusal to accept his explanation may have aroused his resentment. He accused the deceased of "walking up the street" with his wife, and threatened to "hit him so hard that scavengers would have to come down the next morning to get him", or this in substance. Instead of remaining away from trouble upon going to his home, he returned to the controversy; and, when deceased's brother denied knowing him, remarked, "You can get acquainted with me", and, laying off his coat, struck the deceased hard enough to cause him to stagger back, upon picking up his cigar. Even upon being knocked down and lying on the ground, he said to the brother of deceased, "If you let me up, I will clean the whole Runyan family." From what he said, previous malice might have been inferred. His threat to take life preceded the killing long enough to permit of premeditation and deliberation. Though death is infrequently caused by a blow from the fist, it does happen sometimes, and from the fact that accused, prior to the killing, threatened death, in coarse language, returned to the quarrel after having departed, and death resulted from a stroke by him on the body, likely to cause serious injury, there was some room for the inference that the taking of life was with malice aforethought, deliberate, premeditated and with the intent

to kill. The evidence, inasmuch as no weapon other than the fist was used, is not very persuasive, and might not have been thought sufficient to have sustained a conviction of such crime, had the jury so found. But there was some evidence bearing thereon, and the trial court was not bound, at the peril of injecting error into the record, to draw nice distinctions as to the tendency of and accurately weigh the testimony as adduced and definitely ascertain in advance its sufficiency finally to sustain the charge of first degree murder. In other words, the particular offense of an accused in the commission of homicide depends so largely upon the intention and motive actuating him, both inferable only from his conduct and words, that often a careful analysis of all the evidence is necessary, in order to determine the particular offense or degree of offense of which there is sufficient evidence of guilt; and it would be casting too great a burden upon the trial court to exact in advance and in the hurry of the trial such analysis and definite determination, where there is some evidence, even though it may subsequently be found not enough to sustain conviction of one or more of the offenses or degrees of offense submitted. To allow the jury to weigh the evidence in these circumstances and discriminate between the offenses or degrees of offense, instead of the court's first doing so, is not prejudicial to the defendant; for this merely permits them to take into account the tendency of the evidence beyond the offense of which they finally convict. The rule may be thus stated: If there is some evidence having that tendency, so that it cannot be said that the record contains no evidence having a tendency to prove the higher offense, and there has been a conviction of a lower degree, or of one of the included crimes, then the submission of the issue as to the guilt of the higher offense, as murder in the first degree, ought not to be denounced as error, even though, had there been a verdict of guilty thereof, it would not have been allowed to stand. *State v. Baker,* 143 Iowa 224. The case differs from those declaring erroneous the submission of an

issue not included in the indictment, as *State v. Andrews,* 84
Iowa 88, and the like; for here the issue presented is raised
with some evidence to sustain the charge; whereas, in that
class of cases, attention of the jury is diverted to an issue not
involved in the record, and having more or less influence on
those directly involved.  There was no prejudicial error in
submitting the issue as to guilt of murder in the first degree,
though we should have been quite as well, if not better, satis-
fied had this not been done.

VI. The defendant was found guilty of murder in the
second degree and sentenced to the penitentiary at Ft.
Madison "at hard labor for an indeterminate period, as pro-

6. HOMICIDE:
judgment:
murder: inde-
terminate sen-
tence: correc-
tion on appeal.

vided by law for the crime of murder in the
second degree." But there is no provision
in the indeterminate sentence law for the
punishment of the crime of murder; for
murder is expressly excepted from the operation thereof. Sec-
tion 5718-a13, Code Sup., 1913.  The penalty prescribed for
murder in the second degree is "imprisonment in the peni-
tentiary for life, or for a term not less than ten years"; and
the sentence should have been for a definite period.  It was
merely to the penitentiary, without the term's being defined.

Under the statute, this might not have been for less than
ten years, and the circumstances of the homicide are such
that he should not have been sentenced for a longer period.
We fix that period of imprisonment in pursuance of Section
5462 of the Code, authorizing this court to render the judg-
ment the district court should have rendered.  With this
modification, defining the term of imprisonment as ten years,
the judgment is—*Affirmed.*

DEEMER, GAYNOR and SALINGER, JJ., concur.