STATE OF NEW JERSEY, PLAINTIFF-RESPONDENT, v.
RALPH JAMES HUDSON, DEFENDANT-APPELLANT.

Argued September 10, 1962—Decided October 22, 1962.

Mr. *Roy Baylinson* argued the cause for defendant-appellant.

Mr. *Augustine A. Repetto*, Atlantic County Prosecutor, argued the cause for plaintiff-respondent (*Mr. Louis M. Mallin*, First Assistant Prosecutor, of counsel).

The opinion of the court was delivered by

WEINTRAUB, C. J. Defendant was convicted of murder in the first degree, and the jury not having recommended life imprisonment, he was sentenced to die. *N. J. S.* 2A :113–4. He appeals directly to us pursuant to *R. R.* 1 :2–1(c).

Defendant did not dispute his guilt. Rather he contended he was so intoxicated that his crime did not exceed murder in the second degree.

The victim was defendant's wife, Myrtle. They married on October 27, 1959. Their marriage, her second and his third, went poorly. The jury could readily find that defendant physically abused his wife, leading to several separations which he sought to end by force and threats of force. In August 1960 he was convicted of assault and battery upon his wife and of attempting to break into the home of Mr. and Mrs. Lighthizer with whom she had gone to live. In fact he pleaded guilty to assault and battery. Concurrent sentences of six months were imposed.

Defendant was released from jail on December 22, 1960, short of the full period of the sentences. After a visit in Pennsylvania, he returned to Atlantic City at about 6 P. M. on December 26, when he embarked upon a tour of taverns. About 2:15 A. M. on December 27, defendant made several telephone calls to the Lighthizers in which he threatened to kill his wife and also the Lighthizers. The threat to kill his wife was a repetition of a threat he had made at the time of the August incidents mentioned above. At about 7 A. M. defendant made further calls to the Lighthizers in which he again said he would kill his wife and promised trouble for them unless they forced her from their home. Lighthizer arranged to meet defendant outside of Eddy's Bar at about noon. There the argument resumed, and in response to some name-calling, Lighthizer struck defendant with the back of his hand, sending him to the ground. Defendant declined to accompany Lighthizer to police headquarters. Lighthizer went to headquarters to report the matter and was still there when sometime after 2 P. M. defendant was brought in by the police for the killing he had perpetrated in the interim.

The record shows that after Lighthizer left him at noon, defendant entered Eddy's Bar and thereafter Mike's Bar. At Mike's Bar, sometime after 1 P. M., defendant made a telephone call (it was at about this time, according to other testimony, that the deceased received a disturbing call at the restaurant where she was a waitress). Telling the bartender that he was going to kill his wife "with kindness," defendant left and went to a large retail establishment. His mission was to purchase a knife. He proceeded to the hardware section, said to be about a half of a city block from the entrance, where he examined cutlery. He rejected a normal-edged knife and asked for and bought one with a serrated edge, telling the salesgirl that "he wanted it for his mother and that his mother was going to be mad."

From there defendant went directly to the restaurant, reaching it at about 2 P. M. He walked briskly to a table where his wife and three other waitresses, all in identical

uniform, were seated. The composite testimony reveals that he approached his wife from the rear; that he drew the knife from a paper bag and said he was going to "mark up her pretty face" and was going to kill her; that after he tried to cut her throat, which she protected with her hands, he struck two lethal blows in the left lower chest; that as she lay on the floor, he spat upon her, saying "Suffer, Myrtle. Suffer the way you made me suffer. I hope you die. Nobody doublecrosses a Hudson"; "If you don't die now, I will kill you the next time"; that as others tried to relieve her, he said "Don't bother with her now. She is dead"; and that he said her son, William, "is next."

Defendant was disarmed by a patron and employees. He made no effort to flee, although at one point he said he was going to get a pack of cigarettes, in response to which he was seated forcibly. His movements were described as quick and precise, and his speech clear and coherent. He immediately recognized and addressed by name an employee who intervened. On rebuttal, police officers testified that en route to headquarters defendant repeatedly said he had cut his wife and that he wanted his lawyer, whom he mentioned by name.

## I.

As we have said, defendant claimed he was intoxicated at the time of the murder. He testified he did not recall where he was during part of the early morning of the 27th, and although he did recall later events, including his encounter with Lighthizer at noon in front of Eddy's Bar, he denied recollection of anything further until some time after the killing. His complaint is that he was not permitted to bolster this testimony by proof of the influence of liquor upon him on prior occasions.

Whether intoxication on prior occasions may be shown depends upon the issue at hand. Where a defendant asserts insanity, prior intoxication may well be part and parcel of the total picture upon which the claim of insanity depends,

in which event it may be proved. *Martin v. State*, 100 *Ark.* 189, 139 *S. W.* 1122 (*Sup. Ct.* 1911); *cf. State v. Wolak*, 26 *N. J.* 464, 473-474 (1958); *State v. Agnew*, 10 *N. J. L. J.* 165, 169-170 (*O. & T.* 1887); *Weakley v. State*, 168 *Ark.* 1087, 273 *S. W.* 374 (*Sup. Ct.* 1925). Similarly, where a defendant claims insanity while the State asserts he was merely drunk at the time of the crime, the State has been permitted to prove that previously the defendant was violent only when he drank. *Heningburg v. State*, 153 *Ala.* 13, 45 *So.* 246 (*Sup. Ct.* 1907); *Upstone v. People*, 109 *Ill.* 169 (*Sup. Ct.* 1883).

■ Here, sanity was not in issue. Rather the question was whether defendant in fact performed the mental operations the State must prove to elevate the crime from murder in the second degree to murder in the first degree, to wit, premeditation, deliberation, and wilfulness in the execution of the design to kill. If by reason of intoxication, alone or in conjunction with other circumstances, the jury is not satisfied beyond a reasonable doubt that an accused in fact performed all of these mental activities, it must find the State failed to sustain its burden to prove the murder was in the first degree. *State v. King*, 37 *N. J.* 285 (1962); *State v. DiPaolo*, 34 *N. J.* 279, 295 (1961); *State v. Wolak, supra* (26 *N. J.*, at *p.* 477). The question is whether proof of behavior under alcoholic influence on other occasions can reasonably bear upon the degree of its influence at the time of the crime.

The difficulty with such proof is the virtual impossibility of showing that the pertinent conditions were constant. The impact of liquor upon a given individual depends upon variables, such as his physical and mental condition before drinking, the quantity consumed, the rate of consumption, and the time interval between drink and the effect attributed to it. Further, if substantial comparability appeared with respect to these factors, there would still remain the critical question whether on such other occasions the liquor precluded the formation of the criminal intent. For these reasons inquiries

as to prior bouts with liquor would invite collateral trials as to which the State would likely be unprepared and which not only would lengthen the trial but as well would probably tend more to confuse the issue than to cast light upon it. The likelihood of probative contribution is even more remote when, as here, it is not suggested that the accused routinely committed crimes of violence when drunk.

██ Such proof was rejected in *Patterson v. Commonwealth*, 251 *Ky.* 395, 65 *S. W.* 2d 75 (*Ct. App.* 1933); *Real v. People*, 42 *N. Y.* 270, 280 (*Ct. App.* 1870); and perhaps also in *Commonwealth v. Cloonen*, 151 *Pa.* 605, 25 *A.* 145 (*Sup. Ct.* 1892); *cf. Thompson v. Bowie*, 71 *U. S.* (4 *Wall.*) 463, 471, 18 *L. Ed.* 423, 426 (1867). In *State v. Roscus*, 16 *N. J.* 415, 424–425 (1954), it was similarly held that proof of the effect of liquor on other occasions was not admissible to support a defendant's claim that when he signed a confession he was suffering from an extreme neurosis aggravated by excessive drinking that day. Those results are well supported by the general proposition that a trial judge may, in his discretion, exclude evidence when the probative force is meager at best and its admission will lead to collateral inquiries which will unduly prolong the trial and probably confuse or distract from the issue in the case. *Stoelting v. Hauck*, 32 *N. J.* 87, 103 (1960); *Schenck v. Griffin*, 38 *N. J. L.* 462, 471 (*E. & A.* 1875); 2 *Wigmore, Evidence* (3d ed. 1940), §§ 443–44, *pp.* 427–31; Rule 45, *Uniform Rules of Evidence.*

Defendant says that even if proof of prior behavior under liquor is not admissible to show that he did not in fact premeditate, deliberate, or wilfully kill the deceased, nonetheless such evidence should be received to corroborate his testimony that he did in fact drink heavily before the killing. More specifically, he points out that the witnesses at the scene of the crime described his demeanor and physical actions in terms which would suggest sobriety in the ordinary man, whereas liquor affects him differently, manifesting itself only in stories of sheer fancy. In this connection he refers to the testimony of a bartender that about 14 hours before the homi-

cide defendant told him he was going to Florida where he would obtain a plane and fly people to and from Cuba, an enterprise obviously beyond defendant's ability; the testimony of the Lighthizers that in one of the telephone conversations early on the 27th, defendant said he would sue for $22,000 and would foreclose the mortgage on the Lighthizer home whereas he did not hold the mortgage; and finally the testimony of a bartender at Eddy's Bar that shortly after noon on the 27th defendant talked of a "bribe" of $25,000 he was going to get for dropping a case.

Defendant says a jury would not recognize such stories as evidence of alcoholic influence and to that end he should have been permitted to prove that when he drinks he behaves in that manner. But the average juror understands that tall tales are a manifestation of alcoholic influence. Indeed on cross-examination Lighthizer, a State's witness, testified that when defendant drinks he walks quite well but "gets very argumentative. * * * He doesn't talk sense." Moreover there was no room for doubt that defendant had had a considerable quantity of beer (he said he also had whiskey, as to which there was no supporting proof) between 7 P. M. on the 26th and 1 to 1:30 P. M. on the 27th. Indeed, three bartenders testified they refused to serve him because he had had enough, as evidenced to them by the fact that he was boisterous. The last such refusal was within an hour of the murder, as to which the bartender testified he said, "Ralph, you had enough," to which defendant replied, "Mac, I am all right. Let me have a drink," and that when the bartender responded "No, Ralph. I don't want no trouble," defendant left. And as to his general disposition to drink, the jury too had that picture since defendant on direct examination revealed some ten arrests for drunken and disorderly conduct.

In short, the consumption of alcohol was a plain fact. The question was whether defendant nonetheless did premeditate, deliberate and wilfully kill. And although defendant says the excluded proof was intended to prove that liquor in him leads only to romantic yarns, the evidence would inevitably lead to

the inquiry whether on the prior occasions defendant's capacity for crime was in fact impaired and a comparison of the sundry variables we have mentioned. In these circumstances we cannot disagree with the trial judge's exercise of discretion, and in any event we are satisfied that no harm could have ensued from the ruling.

## II.

As stated above, there was testimony that within an hour of the homicide, deceased received a telephone call which disturbed her. Defendant complains there was no identification of the caller. There was, however, testimony offered by the defense that at about that time defendant made a call from Mike's Bar,. following which he said he was going to kill his wife as in fact he did. The jury could infer that defendant made the call in question. And if the jury inferred the message was menacing, the inference would be well warranted by what quickly followed. We see no basis for complaint. There was no dispute that defendant was the slayer. The call bore upon the premeditated character of the murder, and as to that the record was replete with evidence which defendant sought to combat solely by proof of disabling intoxication. Indeed, if it were inferred that the call contained a threat to kill, it could be regarded by the jury as quite bizarre on the part of one bent on present murder and hence some evidence in support of the claim of alcoholic influence.

## III.

Defendant complains of the admission into evidence of pictures of the corpse, contending they were gruesome and inflammatory. The pictures portrayed the victim as she was as a result of his attack. It is of no moment that defendant did not dispute that he killed her. The State was still obliged to prove its case. The photographs revealed the fatal wounds and as well the cuts upon the face and hand and thus corroborated the testimony as to defendant's statements at the time

of the killing and his pursuit of his murderous design after the deceased warded off his initial effort. It was not error to admit them. *State v. Walker,* 33 *N. J.* 580, 596 (1960); *State v. Smith,* 32 *N. J.* 501, 525 (1960), *cert.* denied, 364 *U. S.* 936, 81 *S. Ct.* 383, 5 *L. Ed. 2d* 367 (1961); *State v. Bucanis,* 26 *N. J.* 45, 53–54 (1958), *cert.* denied, 357 *U. S.* 910, 78 *S. Ct.* 1157, 2 *L. Ed. 2d* 1160 (1958).

## IV.

■ Immediately after the murder and at the scene of it, defendant said the deceased's son "is next." The testimony was relevant upon the question whether the killing was premeditated, deliberated upon and wilfully done. Following one of the separations, deceased had gone to the home of her son. He, like the Lighthizers, was a refuge for the deceased from the abuse of defendant, and the son had on a prior occasion warned defendant against further maltreatment of her. The jury could find the killing was motivated by the frustration of defendant's will to hold on to the deceased and by revenge for the complaint which had led to the jail sentence. In these circumstances the threat against the son, made immediately upon the killing of the deceased, was evidential of the state of mind with which the homicide was committed. See *State v. Butler,* 32 *N. J.* 166, 187 (1960), *cert.* denied 362 *U. S.* 984, 80 *S. Ct.* 1074, 4 *L. Ed. 2d* 1019 (1960); *State v. Ehlers,* 98 *N. J. L.* 236, 246–247 (*E. & A.* 1922.) The evidence was properly received. · *Wooten v. State,* 220 *Ark.* 750, 249 *S. W. 2d* 964, 967 (*Sup. Ct.* 1952); *State v. Sayles,* 173 *Iowa* 374, 155 *N. W.* 837 (*Sup. Ct.* 1916); *Layne v. Commonwealth,* 254 *S. W. 2d* 724 (*Ky. Ct. App.* 1953); *Morris v. State,* 182 *Miss.* 763, 183 *So.* 694 (*Sup. Ct.* 1938); *State v. Cade,* 326 *Mo.* 1132, 34 *S. W. 2d* 82 ·(*Mo. Sup. Ct.* 1930); *Fitts v. State,* 102 *Tenn.* 141, 50 *S. W.* 756 (*Sup. Ct.* 1899).

■ Hence we see no merit in the companion claim that the prosecutor committed plain error in referring to the threat in

his summation upon the issue of guilt. The threat, as we have said, bore upon the state of mind with which the homicide was committed, and especially so in view of the defense thesis of intoxication.

Defendant charges the prosecutor urged the jury to consider the threat in deciding upon punishment. There was no objection or request to charge. Plain error is claimed. *R. R.* 1:5-1(a).

*N. J. S.* 2A:113-4 provides for death unless the jury shall "upon and after the consideration of all the evidence," recommend life imprisonment. Insofar as the prosecutor referred to evidence in the case, we cannot say he was out of bounds. Defendant says the prosecutor inferentially suggested that even if the jury thought life imprisonment would otherwise be appropriate, it should nonetheless protect the son against the possibility that the threat would be carried out. There is no direct suggestion to that effect in the summation, and we do not find it to be so evident as to present the question whether it would be plain error for the State so to argue.

The vice of an argument along that line would be the suggestion that a life sentence could be interrupted by parole. The jury here in fact inquired whether, if it recommended life imprisonment, it could be "sure he will never be able to enter our society ever." We cannot infer the jury was concerned specifically with the threat against the son. At any rate, the jury was then instructed that it must not consider the possibility of parole, the charge comporting precisely with our opinion in *State v. White,* 27 *N. J.* 158, 179 (1958). This instruction effectively told the jury it could not, consistent with its oath, omit to return a recommendation because of the existence of the parole authority, and hence directed the jury to disregard any suggestion to the contrary which it might have gathered from the prosecutor's summation.

## V.

■ Defendant complains that the court omitted to charge that a reasonable doubt may arise from the lack of evidence.

There was no objection or request to charge. Plain error is claimed. *R. R.* 1:5–1(a).

The decided weight of authority rejects the proposition that the jury must be charged in so many words that a reasonable doubt may arise from the lack of evidence.[1] The thesis is that if the jury is told that reasonable doubt may exist upon a

---

[1] *Singer v. United States,* 278 *F.* 415, 418 (3 *Cir.,* 1922), *cert.* denied, 258 *U.. S.* 620, 42 *S. Ct.* 272, 66 *L. Ed.* 795 (1922) ; *Ashe v. United States,* 288 *F.* 2d 725, 730 (6 *Cir.,* 1961) ; *Williams v. State,* 159 *Ark.* 170, 251 *S. W.* 370, 371 (*Sup. Ct.* 1923) ; *People v. Del Cerro,* 9 *Cal. App.* 764, 100 *P.* 887, 890–891 (*D. Ct. App.* 1909) ; *Cliff v. People,* 84 *Colo.* 254, 269 *P.* 907, 912 (*Sup. Ct.* 1928) ; *Kennedy v. State,* 191 *Ga.* 22, 11 *S. E.* 2d 179, 184 (*Sup. Ct.* 1940) ; *Thomas v. State,* 129 *Ga.* 419, 59 *S. E.* 246, 248 (*Sup. Ct.* 1907) ; *People v. Ryan,* 349 *Ill.* 637, 182 *N. E.* 803, 804 (*Sup. Ct.* 1932) ; *Springer v. State,* 209 *Ind.* 322, 196 *N. E.* 97, 103 (*Sup. Ct.* 1935) ; *State v. Wilson,* 108 *Kan.* 433, 195 *P.* 618, 619 (*Sup. Ct.* 1921) ; *State v. Ferguson,* 240 *La.* 593, 124 *So.* 2d 558, 572–573 (*Sup. Ct.* 1960), *cert.* denied, 366 *U. S.* 913, 81 *S. Ct.* 1089, 6 *L. Ed.* 2d 237 (1961) ; *State v. Frazer,* 363 *Mo.* 77, 248 *S. W.* 2d 645, 647 (*Sup. Ct.* 1952) ; *State v. De Lea,* 36 *Mont.* 531, 93 *P.* 814, 816–818 (*Sup. Ct.* 1908) ; *People v. Radcliffe,* 232 *N. Y.* 249, 133 *N. E.* 577, 578 (*Ct. App.* 1921) ; *Lacy v. State,* 30 *Okl. Cr.* 273, 236 *P.* 53, 54 (*Cr. Ct. App.* 1925) ; *Commonwealth v. Evancho,* 175 *Pa. Super.* 225, 103 *A.* 2d 289, 291–292 (*Super. Ct.* 1954), affirmed opinion below, 379 *Pa.* 273, 108 *A.* 2d 719 (*Sup. Ct.* 1954) ; *State v. Swygert,* 130 *S. C.* 91, 124 *S. E.* 636, 641 (*Sup. Ct.* 1924) ; *Zwicker v. State,* 27 *Tex. Cr.* 539, 11 *S. W.* 633, 634 (*Ct. App.* 1889) ; *State v. Perkins,* 32 *Wash.* 2d 810, 204 *P.* 2d 207, 239–243 (*Sup. Ct.* 1949), *cert.* denied, 338 *U. S.* 862, 70 *S. Ct.* 97, 94 *L. Ed.* 529 (1949) ; *Hedger v. State,* 144 *Wis.* 279, 128 *N. W.* 80, 90–91 (*Sup. Ct.* 1910).

By a vote of 5 to 4, the Supreme Court of Iowa held that failure to refer to lack of evidence constitutes reversible error. *State v. Anderson,* 209 *Iowa* 510, 228 *N. W.* 353, 355–356 (*Sup. Ct.* 1929). Three jurisdictions seemingly find error only if defendant requests a charge to that effect. *Simmons v. State,* 156 *Fla.* 353, 22 *So.* 2d 803, 804 (*Sup. Ct.* 1945) ; *Brooks v. State,* 52 *So.* 2d 616, 620 (*Miss. Sup. Ct.* 1951), appeal dismissed for want of jurisdiction and *cert.* denied, 342 *U. S.* 863, 72 *S. Ct.* 114, 96 *L. Ed.* 649 (1951) ; *Trimble v. State,* 118 *Neb.* 267, 224 *N. W.* 274, 275–276 (*Sup. Ct.* 1929).

Alabama held a refusal so to charge was not reversible error where the testimony fully explored the issues in the case, *Walker v. State,* 33 *Ala. App.* 614, 36 *So.* 2d 117, 119–120 (*Ct. App.* 1948), and the same result was reached in North Carolina where the State's evi-

consideration of all the evidence, it is unmistakably clear that the evidence may be found wanting either as to the sufficiency or credibility of what is on hand or because of the absence of evidence adequate to establish all elements of the offense beyond a reasonable doubt. Indeed, one court has found that an affirmative statement with respect to lack of evidence, charged at the request of the prosecution, militated against the accused by suggesting the doubt should not be entertained if the void could have been filled by him. *People v. Ryan*, 349 *Ill.* 637, 182 *N. E.* 803, 804 (*Sup. Ct.* 1932).

A consideration of the cases in our State begins with *State v. Andrews*, 77 *N. J. L.* 108 (*Sup. Ct.* 1908). The charge was forgery and uttering. Guilt depended upon whether the defendant altered a warrant after it was executed by the city comptroller. The defense requested a charge that if a reasonable doubt existed as to whether the alteration occurred before or after the comptroller signed the warrant, there must be acquittal. The trial court so charged, but added that "your reasonable doubt as to whether it was before or after must be founded upon some evidence that was presented in this cause" (at *p.* 109). This addition was held to be error "as it excluded all reasonable doubt that may have arisen from the lack or want of evidence." (at *p.* 110.) The case did not hold that it is necessary to state affirmatively that a reasonable doubt may arise from the lack of evidence. Rather it condemned a charge which in positive terms said that a reasonable doubt may not arise from that lack.

In *State v. De Paola*, 5 *N. J.* 1 (1950), the trial court refused to charge that "reasonable doubt may be engendered by lack of evidence." (at *p.* 8.) The charge as given referred

dence was direct, rather than circumstantial, and was "amply sufficient to support the verdict." *State v. Hammonds*, 241 *N. C.* 226, 85 *S. E.* 2d 133, 139 (*Sup. Ct.* 1954).

We note the statement in 67 *A. L. R.* 1372 (1930), that "It is generally held that the failure to include the phrase 'lack of evidence' or its equivalent \* \* \* is erroneous," although "not reversible." However, we believe that our resume reflects the present state of the authorities.

to reasonable doubt "upon such proof," referring to the evidence in the case, and this was held to come within the holding of *Andrews*.

Shortly thereafter, however, in *State v. Myers*, 7 N. J. 465 (1951), *De Paola* was explained in terms consistent with our resume of *Andrews*. In *Myers* the trial court refused a request that the defendant had no duty to present evidence "and if there is any material part of the case which is not proved beyond a reasonable doubt, then you must acquit the defendant." (at *p.* 481.) The trial court charged that the burden of proof beyond a reasonable doubt remained with the State (at *p.* 481):

"* * * until and after all the evidence is in, when the jury must consider upon all the evidence in the case whether or not this burden has been sustained. If the jury are then satisfied upon all the evidence that the defendant is proved guilty beyond a reasonable doubt, the verdict must be guilty of the crime so proven. If not so satisfied, the verdict must be not guilty."

Our court said (at *p.* 481):

"Here, again, the substance of the request was covered by the court's charge. The jury was instructed that it must determine whether the State had carried its burden of proof. *The import was inescapable in the charge as given that if the State failed to do so, either by conflicting evidence or by lack of evidence*, leaving a reasonable doubt in the minds of the jury, its duty was to bring in a verdict of acquittal." (Emphasis added.)

The court distinguished *De Paola*, saying that there, as in *Andrews*, the instruction was so phrased that "the burden was inferentially cast upon the defendant to produce evidence that would create reasonable doubt and so justify his acquittal" (at *p.* 482).

In *State v. Cutrone*, 8 N. J. Super. 106 (*App. Div.* 1950), decided shortly before *De Paola*, the trial court refused to charge that "A reasonable doubt may be engendered by lack of evidence." (at *p.* 110.) The charge as given described the State's burden and added that a reasonable doubt is "that

state of the case, where, *after an examination and comparison of all the evidence* you cannot say that you feel an abiding conviction to a moral certainty of the guilt of the defendant." (at *p.* 110, emphasis added.) The Appellate Division found there was no error for the reason that the charge as given included the substance of the request, saying (at *p.* 111) :

"* * * The instructions in the instant case as to presumption of innocence, burden of proof and reasonable doubt, plainly mean that the defendant must be acquitted if the State has failed to present sufficient evidence of guilt, whether we classify the deficiency as lack of evidence, want of corroboration, or some defect in the quality of the proofs."

See also *State v. Perrella*, 21 *N. J. Super.* 550 (*App. Div.* 1952).

The issue was again before us in *State v. Walker*, 33 *N. J.* 580 (1960), where we concluded the charge came within *De Paola*. Finally in *State v. Driver*, 38 *N. J.* 255, 293–294 (1962), we advised trial judges to include a reference to lack of evidence in their standard instruction to avoid a recurrence of this highly metaphysical debate, advice which we now repeat.

We have made this exposition of the views upon the topic to indicate that it is far from evident that the conventional charge of reasonable doubt upon all the evidence in the case would be understood by a jury to exclude a doubt arising from lack of evidence. Indeed the very inconsistency of the course of the decisions in our State suggests the quarrel revolves about abstractions of little or no practical import. In this light, we can hardly say that the omission of a specific reference to lack of evidence constituted plain error. Surely the instruction given nowhere stated the contrary. And when it is added that defendant's connection with the criminal event did not depend upon circumstantial evidence and that the case is so replete with proof upon the issue of degree of guilt that it is difficult to imagine what evidence is lacking, the claim of plain error must surely fail. See *Walker v. State*,

*supra, n.* 1 (*33 Ala. App.* 614, 36 *So. 2d* 117); *State v. Hammonds, supra, n.* 1 (241 *N. C.* 226, 85 *S. E. 2d* 133).

## VI.

As stated in the recital of the facts, the State on rebuttal called two officers who testified that en route to headquarters shortly after the homicide, defendant said he had cut his wife and wanted a lawyer he specified by name. Defendant contends the State unfairly withheld a "confession" until the rebuttal stage. There was no irregularity in the order of proof. There was overwhelming direct evidence that defendant was the culprit, evidence which indeed was not disputed. The rebuttal proof was properly received to meet the defendant's testimony of intoxication and total unawareness of events until sometime after incarceration.

## VII.

Finally, defendant contends the verdict was against the weight of the evidence as to the degree of murder. It is unnecessary to repeat the proof already stated. The verdict was amply supported by the evidence. Nothing suggests it was the result of mistake, partiality, prejudice or passion. *R. R.* 1:5-1(a).

The judgment is affirmed.

*For affirmance*—Chief Justice WEINTRAUB and Justices JACOBS, FRANCIS, PROCTOR, HALL, SCHETTINO and HANEMAN—7.

*For reversal*—None.