Lewis E. MULLINS,
Defendant-Appellant,

v.

STATE of Indiana, Plaintiff-Appellee.

No. 3–185A8.

Court of Appeals of Indiana,
Third District.

Dec. 19, 1985.

Susan K. Carpenter, Public Defender, M.E. Tuke, Deputy Public Defender, Indianapolis, for defendant-appellant.

Linley E. Pearson, Atty. Gen., Gary Damon Secrest, Deputy Atty. Gen., Indianapolis, for plaintiff-appellee.

GARRARD, Judge.

Following his second trial for the instant offense,[1] Lewis Mullins was convicted of child molestation, a Class B felony. IC 35–42–4–3(a). Mullins received a sentence of six (6) years. He now appeals this conviction raising five issues for review which we rephrase as follows:

1) Whether the trial court committed fundamental error in failing to specifically instruct the jury on the element of criminal intent in this prosecution for child molestation.

2) Whether the evidence adduced at trial was so inherently incredible and unworthy of belief that it must be concluded the conviction was not supported by sufficient evidence.

3) Whether an instruction that a defendant could be convicted for child molestation on the uncorroborated testimony of the victim unduly emphasized the testimony of one witness.

4) Whether Mullins' instruction that a reasonable doubt as to an essential element of the crime could arise from a lack of evidence was erroneously refused.

5) Whether Mullins was denied effective assistance of counsel when his attorney failed to make a motion to strike

the testimony of the State's serologist, Larry Huys.

## I. Failure to instruct on criminal intent.

In its final charge to the jury, the trial court read the information charging Mullins, the applicable portion of the child molestation statute and the elements the State had to prove, as follows:

"This is a criminal case brought by the State of Indiana against LEWIS E. MULLINS. The case was begun with the filing of an Information. The Information in a criminal case is only an accusation. It is merely the formal method of charging a defendant with a crime. The Information is not evidence. The charge must be proven by evidence introduced during trial.

The Information in this case charges LEWIS E. MULLINS with CHILD MOLESTING, and the Defendant has pled not guilty to the charge. The State of Indiana has the burden to prove to each of you, beyond a reasonable doubt, every essential element of the charge.

Omitting the formal parts, the Information reads as follows:

'On or about the 1st day of September, 1982, in St. Joseph County, State of Indiana, LEWIS EDWARD MULLINS did perform deviate sexual conduct, to-wit: by LEWIS EDWARD MULLINS placing his penis into the rectum of [H.C.] with [H.C.] a child who was then under the age of twelve (12) years.'

"The statute defining the offense of CHILD MOLESTING reads as follows:

'A person who, with a child under twelve (12) years of age, performs or submits to sexual intercourse or deviate sexual conduct commits Child Molesting....' (IC 35–42–4–3(a))

' "Deviate sexual conduct" means an act of sexual gratification involving a

---

**1.** Mullins' first trial for this offense ended when the trial court declared a mistrial after the jury had indicated that it was deadlocked.

sex organ of one person and the mouth or anus of another person.'

To sustain the charge of Child Molesting, the State must prove the following propositions:

That the Defendant:

1. performed deviate sexual conduct with [H.C.].
2. that [H.C.] was under twelve (12) years of age.

If you find from your consideration of all the evidence that each of these propositions has been proven beyond a reasonable doubt, then you may find the Defendant guilty.

However, if you find from your consideration of all the evidence that any of these propositions has not been proved beyond a reasonable doubt, then you should find the Defendant not guilty."

Mullins made no objection to these or any of the other instructions given by the trial court on grounds of the absence of a specific reference to the criminal intent required. Further, Mullins did not raise this issue in his belated motion to correct errors. In order to avoid complete waiver of this issue because of the foregoing procedural defaults, Mullins has attempted to characterize the failure to specifically instruct on the element of criminal intent as fundamental error.

The State recognizes that regardless of the fact that there is no specific mention of any criminal intent element or any *mens rea* in the relevant portion of the child molestation statute,[2] that *mens rea* is in fact an element of child molestation. *Newton v. State* (1983), Ind.App., 456 N.E.2d 736, 739, n. 1. The issue is whether or not the trial court committed fundamental error denying Mullins due process by not specifically delineating the *mens rea* necessary for a conviction of child·molestation.

The Supreme Court of Indiana dealt with the same issue in *Snider v. State* (1984), Ind., 468 N.E.2d 1037, although the case had come before it on a slightly different procedural posture. In *Snider*, the defend-

ant never raised the trial court's failure to specifically instruct on a criminal intent element until his complaint for post-conviction relief. As in the present case, the trial court in *Snider* had instructed the jury on the elements of child molesting by tracking the child molestation statute. In *Snider* additional references were made to child molestation as a Class A felony where the offense involves the use or threat to use deadly force or while the offender is armed with a deadly weapon. After distinguishing the case of *Morissette v. United States* (1952), 342 U.S. 246, 72 S.Ct. 240, 96 L.Ed. 288, wherein the trial court had ruled that felonious intent was to be presumed, the Indiana Supreme Court in *Snider* found that:

"The rulings of the trial court in the Morissette case completely and effectively eliminated criminal intent as an ingredient of the offense. Instructions [sic] # 17 involved in this case does not eliminate or prohibit consideration of the intent to molest or injure. It does not preclude the defense from proving or arguing that any touching of the child was innocent. And it is in perfect accord with the statute which it · purports to present. The instruction furthermore utilizes words which refer to deliberate injurious conduct, words which in their plain meaning would be understood by the jury as including criminal intent. The worst that can be said of this instruction is that it would have been clearer if it had sorted out criminal intent and separately referred to it. Fundamental error is one which if not rectified would deny fundamental due process. *Malo v. State* (1977), 266 Ind. 157, 361 N.E.2d 1201. This instruction had no such egregious influence upon the trial resulting in appellant's conviction. There is therefore no basis for relieving appellant of his prior procedural default and the judgment denying post-conviction relief is affirmed."

■ Despite the different procedural posture, the issue decided by *Snider*, that

---

**2.** IC 35–42–4–3(a).

there is no fundamental error where a court's instructions on child molestation fail to sort out and separately refer to the criminal intent element so long as that element is not eliminated or consideration of it prohibited by the tendered instructions, is dispositive here. Absent a showing of fundamental error, Mullins' failure to object to the absence of a specific criminal intent instruction and offer one himself as well as his failure to allege this error in his motion to correct errors constitute a waiver of this issue ending further consideration on appeal.

## II. Sufficiency of the evidence.

Our standard of review when the sufficiency of the evidence is challenged is well settled. We will not reweigh the evidence or judge the credibility of the witnesses upon review. Rather, we will consider only that evidence most favorable to the State and reasonable inferences adduced therefrom. When there is substantial evidence of probative value sufficient to establish each element of the crime charged beyond a reasonable doubt, the verdict will not be disturbed. *Loyd v. State* (1980), 272 Ind. 404, 398 N.E.2d 1260, 1264, *cert. denied* 449 U.S. 881, 101 S.Ct. 231, 66 L.Ed.2d 105.

Mullins contends that the only direct evidence linking him to the molestation of H.C. is the testimony of H.C. and her brother B.C. Mullins argues that the testimony of H.C., eleven years old at the time of the offense and twelve at the trial, and the testimony of B.C., nine years old at the time of the offense and ten at the trial, is inherently incredible and unworthy of belief. Mullins cites the cases of *Thomas v. State* (1958), 238 Ind. 658, 154 N.E.2d 503, and *Penn v. State* (1957), 237 Ind. 374, 146 N.E.2d 240, for support. In *Stewart v. State* (1982), Ind., 437 N.E.2d 1328, at 1330 n. 2, the Supreme Court explained its holding in *Thomas* as follows:

"Defendant cites *Thomas v. State* (1958), 238 Ind. 658, 154 N.E.2d 503, wherein we reversed a conviction for public indecency based solely upon the testimony of two girls, ages seven and eight. In *Thomas*, unlike the case at bar, not only was the credibility of the girls highly suspect, but also the appellant had presented an unimpeachable alibi."

In *Penn*, the husband was accused of the statutory rape of the couple's frequent babysitter. The babysitter had testified that she often stayed overnight to babysit in the morning and eventually began sleeping in the same bed as husband and wife wherein husband would engage in intercourse first with one then with the other, with the knowledge of both. The babysitter further maintained that she and the wife never talked about these experiences or the subject of sex at all. The *Penn* court found her testimony so improbable and incredible that reasonable men would not find that husband's guilt had been established beyond a reasonable doubt. The *Penn* court maintained:

"In the extremely rare instances where the parties are so depraved that they see nothing wrong with two women sleeping and sharing the sexual attention of the husband of one of them in the same bed, then it is inconceivable that on the occasions thereafter when the women were together they would never mention the experience nor talk about sex."

237 Ind. at 382, 146 N.E.2d at 243.

In the case at bar, H.C. testified that Mullins, who was a babysitter to her, her sister and her two brothers, had called her up to the bathroom of her house and, clothed only in a towel around his waist, asked her if she wanted to "do it." H.C. refused and returned downstairs. She testified further that her brother P.J. had left the house by this time to deliver Pennysavers in the neighborhood. Mullins sometime later again called H.C. up to the bathroom and after she repeatedly refused his requests he pulled H.C.'s pants and underwear down and inserted his penis into H.C.'s rectum. H.C. told her mother of the assault when she returned to the home later that afternoon.

Mullins challenges the credibility of H.C. because of the conflicting reports given at the hospital as to why H.C. had been brought in. H.C.'s mother had indicated to some of the hospital personnel that H.C. may have been constipated. H.C.'s mother had also instructed H.C. to tell the hospital personnel that a little boy her own age had "messed with her," rather than Mullins. A nurse at the hospital testified that H.C. indicated a couple of times that an eleven year old boy had messed around with her but then indicated that was not the truth and that her babysitter, Mullins, had molested her. However, not only were these conflicting reports detailed to the jury but H.C.'s mother explained why she instructed H.C. to indicate that an unknown eleven year old boy had messed with her on direct examination as follows:

"A. So I told Lewis to wait there until I found out whether my daughter had been touched. And I was scared to death about Welfare coming in on it.

Q. Why?

A. Well, I've had a little bit of problem in the past. You know, with—we got kicked out of this one house. And Welfare stepped in and wanted to take my kids away.

So I thought to protect everybody that I would say that my daughter said she had been touched by a little boy about her age, until I knew for sure what had really happened.

Like I say, I didn't really want to believe anything had happened. She is my own flesh and blood. I didn't want anything to happen to her, you know. So we told the doctor this. And he went to examine her and I left the room. And one of the first things that was told to me is that there would be a lady from the Welfare Department and a police officer come in to ask questions. And I really started to panic then, because, you know, it was like one big nightmare.

So after the doctor examined her and everything, he called me back into the room and had shown me on the rectum that the tissue had been torn. He said that she had been through a sudden trauma.

That's when I told him about Lewis babysitting and everything. I explained to him why I told him the story I did about the little boy, because I wanted to protect everybody."

(R. 378–9). H.C.'s mother further explained herself on cross-examination as follows:

"Q. Well, was there something that your daughter had done or that you thought your daughter had done that the Welfare would step in?

A. No, sir, just the fact that with the judicial system the way it is, the Welfare and the police always step in on these kinds of things. And the first thing that entered my mind is that people are going to try to hold me responsible when I had a babysitter. I was scared. This was my daughter. It was bad enough—it's like if a kid falls down and skins up his knee. You would rather have him skin up his knee rather than his face. You don't want that child to be scarred.

"I did not want to believe that my daughter may have been scarred in some way. Okay? And Welfare, these days, first thing they want to do is yank kids away from you the minute something like this happens.

So I had to protect Lewis until I got the test results. I was protecting my daughter. And at the same time, I was protecting the other three. My family has never been separated. And I wasn't about to allow that to happen."

(R. 397).

Additionally, H.C. testified that her brother B.C. entered the bathroom while Mullins was molesting her and that the bathroom door had not been locked. B.C.'s testimony was somewhat inconsistent. While he testified that when he entered to use the bathroom he observed Mullins "going up and down" on H.C., he stated that the door had been locked and that his

brother, P.J., who was supposedly out delivering papers, helped him to get the door unlocked.

The jury was fully informed concerning the initial inconsistent reports at the hospital as to who had molested H.C. and heard a reasonable explanation for these inconsistencies from H.C.'s mother. H.C. clearly identified Mullins as the individual who performed anal intercourse upon her. It was up to the jury to determine H.C.'s credibility and the weight to be accorded her testimony. H.C.'s testimony and perhaps more importantly the explanation of the initial deception were not so improbable or incredible to render her testimony incapable of proving Mullins' guilt beyond a reasonable doubt. We have long held that the uncorroborated testimony of the victim of a sex crime is sufficient evidence upon which to base a conviction. *Skaggs v. State* (1982), Ind.App., 438 N.E.2d 301, citing *Riddle v. State* (1980), 273 Ind. 112, 402 N.E.2d 958. Therefore, the jury could have disregarded B.C.'s testimony altogether and still found Mullins guilty. We do not, however, believe B.C.'s testimony is necessarily unworthy of belief merely because of the inconsistency surrounding the manner in which he entered the bathroom. The jury was well aware of this inconsistency and able to judge the credibility of B.C. accordingly. We will not again judge his credibility on appeal.

Moreover, there was corroborative circumstantial evidence that H.C. had been subject to anal intercourse. Larry Huys, a serologist, testified as to the presence of sperm in a rectal smear which had been taken from H.C. at the hospital. Although the examination of other rectal smears at the hospital did not indicate the presence of sperm, the physician who examined H.C. did note several fresh superficial tears around H.C.'s rectum and several bruises and abrasions on H.C.'s hip, right buttock and pelvis consistent with anal intercourse.

The evidence was sufficient to sustain a conviction.

*III. Instruction on the uncorroborated testimony of the victim.*

■ At the request of the State the trial court gave the following instruction:

"In the State of Indiana, a defendant may be convicted of child molesting on the uncorroborated testimony of the victim."

The following objection was tendered by Mullins' attorney to the giving of this instruction:

"Yes. On No. 2, we believe it is a statement of appellate law, as opposed to an appropriate instruction to the jury that under this it tends to intimate a weight to be given to a particular witness' testimony.

We believe that while the State might be entitled to an instruction, that a victim's testimony should be judged by the same criteria as that of any other witness.

This does more than that. It points out that it can be sufficient to sustain a conviction.

While that may be the law of appellate review, it puts undue emphasis to uncorroborated testimony."

Mullins maintains on appeal that this instruction unduly emphasized the testimony of one witness, H.C., over the other evidence presented at trial.

Substantially the same instruction has withstood challenges on several occasions on appeals from convictions for various sex offenses. *See Lottie v. State* (1980), 273 Ind. 529, 406 N.E.2d 632, 636 (instruction given in rape conviction upheld); *Skaggs v. State* (1982), Ind.App., 438 N.E.2d 301, 307–8 (instruction given in child molestation conviction upheld, citing *Lottie*); *Hiner v. State* (1984), Ind.App., 470 N.E.2d 363, 370–1 (instruction given in rape conviction upheld since other instructions covered issue of witness credibility even though uncorroborated testimony of victim instruction did not specifically state that to convict the uncorroborated testimony had to be believed by the jury). Our Supreme Court, in *Lottie*, disposed of a defendant's challenge to an uncorroborated testimony in-

struction as giving undue weight to the victim's testimony, determining that:

> "Appellant claims that this is an incomplete statement of the law and that it invites the jury to give undue weight to the testimony of the victim since it does not advise the jury that the uncorroborated testimony of the victim would be sufficient only if it is adequate to convince any rational trier of fact that the defendant committed the essential elements of the crime charged beyond a reasonable doubt. The appellant is correct, of course, in stating that the jury should consider the evidence in this manner. However, it is also true that instructions are not to be considered as disjointed statements or principles but are to be considered as a whole and are to be read together. *Henderson v. State* (1979) [271] Ind. [633], 395 N.E.2d 224; *Tewell v. State* (1976), 264 Ind. 88, 339 N.E.2d 792. The jury was fully instructed as to all of the elements that must be proved beyond a reasonable doubt before the defendant could be found guilty and the burden of proof the state must carry throughout the entire cause. They were instructed on the presumption of innocence of the defendant and given a definition and explanation of reasonable doubt. They were instructed on the credibility of witnesses and the weight to be given to the testimony of each witness. Instructions were given on the manner in which they were to deliberate and to determine the facts and the law.

They were instructed that there is no burden on the defendant to prove anything, and that the fact that he fails to prove or disprove anything cannot be used in any manner to determine his guilt.

The instruction given was not a mandatory instruction that advised the jury that they must act or respond in a certain way. It was merely an explanation of the law in an area which likely would not be understood by lay people. There was no error in the giving of this instruction."

406 N.E.2d at 636.

After reviewing the final instructions as read to the jury we are convinced that the particular instruction on the uncorroborated testimony of the victim gave no undue weight to the testimony of H.C. As in *Lottie*, the instruction given here was not mandatory in requiring the jury to follow its import, but rather was explanatory and in no way harmful to Mullins.[3]

*IV. Rejected instruction on lack of evidence.*

Mullins tendered the following instruction which was refused by the trial court:

> "A reasonable doubt may exist or arise not only from the evidence but also from the lack of evidence relating to an essential element of the crime."

■ The three-pronged standard by which we review a trial court's refusal to give a tendered instruction requires us to

---

**3.** The trial court's instructions immediately preceding the uncorroborated testimony instruction clearly emphasized the importance of weighing all the evidence and testimony in attempting to reach a decision. Furthermore, the greatest emphasis was on determining the truth and not on any one individual's testimony. The pertinent instructions read:

> "You should try to fit the evidence to the presumption that the defendant is innocent. You should not disregard the testimony of any witness without a reason and then only after careful consideration.
>
> However, if you decide that a witness' testimony is so unreasonable as to be unworthy of belief, or if you find so much conflict in the testimony that you cannot believe all of the witnesses, then you must decide which of the witnesses you will believe and which of them you will disbelieve.
>
> In weighing the testimony to determine what or whom you will believe, you should use your own knowledge, experience, and common sense gained from day-to-day living.
>
> You may find that your determination of the truth is not controlled by the number of witnesses who testify to a particular fact, or on one side or the other, or the quantity of evidence on a particular point.
>
> You should give the greatest weight to that evidence which convinces you most strongly of its truthfulness.
>
> In the State of Indiana, a defendant may be convicted of child molesting on the uncorroborated testimony of the victim."

consider: (1) whether the tendered instruction correctly states the law; (2) whether there is evidence in the record to support the giving of that instruction; and (3) whether the substance of that instruction is covered by the other instructions given. *Mitchell v. Turner* (1985), Ind.App., 484 N.E.2d 967; *Shull v. B.F. Goodrich Co.* (1985), Ind.App., 477 N.E.2d 924, 926; *Hogston v. Schroyer* (1983), Ind.App., 449 N.E.2d 291, 293. Since the substance of this instruction was covered by other instructions which were given, there was no reversible error in refusing to give this instruction.

■ In refusing Mullins' instruction on lack of evidence the trial judge indicated that he believed the tendered instruction was covered by the trial court's instructions 3 and 4 and that adding Mullins' instruction to these would "tend to be confusing" to the jury. Instructions 3 and 4 state:

### "COURT'S INSTRUCTION NO. 3

Under the law, you must presume that the Defendant is innocent, and must continue to do so throughout the trial, unless the State proves every essential element of the crime with which the Defendant is charged beyond a reasonable doubt.

Because he is presumed to be innocent, the Defendant is not required to present any evidence to prove his innocence or to provide any explanation. If, at the end of the trial, you have a reasonable doubt concerning the Defendant's guilt, you must find him not guilty.

### "COURT'S INSTRUCTION NO. 4

A 'reasonable doubt' is a fair, actual and logical doubt. It is a doubt based upon reason and common sense and not a doubt based upon imagination or speculation.

If, after impartially considering all the evidence and circumstances in the case, you reach such a firm belief in the Defendant's guilt that you would feel safe to act upon that belief without hesitation, in a matter of the highest concern and importance to you, when you are not required to act at all, then you will have reached that degree of certainty which excludes reasonable doubt and allows conviction.

The rule of law which requires proof of guilt beyond a reasonable doubt applies to each juror individually. Each of you must refuse to vote for conviction unless you are convinced beyond a reasonable doubt of the Defendant's guilt. Your verdict must be unanimous."

The very issue raised by Mullins was dealt with by our Supreme Court in *Springer v. State* (1935), 209 Ind. 322, 196 N.E. 97. In *Springer* the defendant argued it was error to fail to instruct the jury that a reasonable doubt may arise from the lack or want of evidence. The Supreme Court responded:

"That this proposition finds support in the decided cases there can be no doubt. If there exists in the mind of the jurors or any one of them at the close of any criminal case, a reasonable doubt of the guilt of the defendant, it is either because of the evidence or because there was a want of evidence. In other words the state has not proven the defendant guilty of the crime charged beyond a reasonable doubt. If the evidence adduced is sufficient to convince the minds of the jurors that the defendant is guilty of the crime charged beyond a reasonable doubt then there is no reasonable doubt in the minds of the jurors or any one of them, arising either from the evidence or from the want of evidence. To instruct the jury that a reasonable doubt may arise from the evidence or from the want of evidence, is only another way of saying that the evidence must be such that convinces the mind of each juror beyond a reasonable doubt that the defendant is guilty of the crime charged."

209 Ind. at 337, 196 N.E. at 103. The court went on to say that the other instructions of the trial court covered the burden on the State to prove beyond a reasonable doubt every material element of the crime

charged.[4] The same rationale applies here as the trial court adequately instructed the jury on the State's burden to prove every element beyond a reasonable doubt so as to convince every juror that conviction is warranted. The trial court committed no error in refusing Mullins' tendered instruction.

## V. Effective assistance of counsel.

█ Finally, Mullins contends that he was denied effective assistance of counsel because of his trial counsel's failure to make a motion to strike the testimony of serologist Larry Huys, who was the only person testifying to having found the presence of spermatozoa on rectal swabs taken from H.C. Huys was permitted to testify out of order with the caveat that a motion to strike would be made "in the event the items examined by him were not linked to the case by a proper chain of custody and identification." (Affidavit of Mullins' trial counsel attached to belated motion to correct errors, R. 6). No such motion was made and Mullins' trial counsel admitted that his failure to so move was not the result of a tactical or strategic decision.

Our Supreme Court has recently detailed the applicable standard which an appellant claiming ineffective assistance of counsel must show, concluding that:

"To succeed on an ineffective assistance of counsel claim, appellant must satisfy the *Strickland* performance-prejudice standard. *Strickland v. Washington* (1984), [466] U.S. [668], 104 S.Ct. 2052, 80 L.Ed.2d 674. The performance component requires appellant to show that counsel's performance was deficient. The attorney performance standard is reasonably effective assistance which is objectively measured by the prevailing professional norms. To satisfy this criterion, appellant must overcome the strong presumption that counsel's conduct lies within the wide range of reasonable pro-

fessional assistance. The prejudice component requires appellant to show that counsel's unreasonable performance not only prejudiced the defense, but also that this prejudice undermined the reliability and fairness of the proceeding."

*Osborne v. State* (1985), Ind., 481 N.E.2d 376, 379. Furthermore, the *Strickland* court recognized that the court reviewing an ineffectiveness claim need not address these components in a specific order or even address both components when there is an insufficient showing on one of them. *Strickland v. Washington* (1984), 466 U.S. 668, 104 S.Ct. 2052, 2069–70, 80 L.Ed.2d 674. In the present case our inquiry begins and ends with the prejudice component because Mullins is unable to demonstrate any prejudice stemming from his counsel's failure to move to strike Huys' testimony.

The case at bar is quite similar to those cases where an ineffective assistance of counsel claim is based upon the failure to object to the introduction of certain testimony or evidence at trial. Under the *Strickland* performance-prejudice standard the Indiana Supreme Court has consistently rejected such claims based upon the failure to object. *See Bieghler v. State* (1985), Ind., 481 N.E.2d 78, 97 (defense counsel's failure to object to the admission of a "super .38" pistol, used to show that it had not been utilized in the commission of two murders bolstering the State's case against defendant's "super .38" being the murder weapon, was held insignificant since an objection would have likely been fruitless due to other direct evidence linking casings found at the murder scene to defendant's weapon); *Forehand v. State* (1985), Ind., 479 N.E.2d 552, 555 (defense counsel's failure to object to police officer's testifying that a confidential informant told him that defendant desired to sell drugs, as hearsay, did not deprive defendant of adequate assistance of counsel since the testimony was

---

**4.** Furthermore, our research uncovered a case from the Supreme Court of New Jersey indicating that "[t]he decided weight of authority rejects the proposition that the jury must be charged in so many words that a reasonable doubt may arise from the lack of evidence."

*State v. Hudson* (1962), 38 N.J. 364, 185 A.2d 1, 6 (citing in a footnote cases from two Circuit Courts of Appeal and decisions from seventeen states including the *Springer* case from Indiana.)

admitted to show why the officers took the action they did and not for the truth of the matter asserted therein); *Coble v. State* (1985), Ind., 476 N.E.2d 102, 106–7 (defense counsel's failure to object to psychiatrist's testimony concerning defendant's criminal history as irrelevant failed to demonstrate ineffective assistance as psychiatrist's testimony was relevant because defendant's insanity defense opened up his entire life for examination). *See also Osborne v. State* (1985), Ind., 481 N.E.2d 376, 380 (defense counsel's failure to challenge a jury instruction does not support an ineffective assistance of counsel claim because the instruction was permissible).

It is equally clear in the present case that a complete and proper chain of custody over H.C.'s "rape kit" was established rendering trial counsel's failure to move to strike Huys' testimony insignificant. The trial judge below attached a very useful memorandum in support of his order denying Mullins' motion to correct errors, which detailed the chain of custody as follows:

"At the second trial, Dr. Crofoot testified that he gathered specimens from [H.C.] and gave them to the nurse, Ms. Kimbrell. Ms. Kimbrell testified that Dr. Crofoot took the swabs and implanted them on the slides; that she placed the slides in an envelope marked 'rectal swabs', which she placed into the 'rape kit', which she sealed and gave to Officer Bonnie Brogan (Werntz). Officer Werntz testified that the nurse gave her the sealed sexual assault evidence kit, which Officer Werntz then took first to the refrigerator in the rape investigation room, and later to the laboratory. Mr. Huys testified that he examined a sexual assault kit labelled '[H.C.]' that had been delivered to him by Officer Werntz and placed in the laboratory vault until November 24, 1982, when Huys removed the kit and broke the seals.

This evidence strongly suggests the whereabouts of the sexual assault kit at all times and allowed the trier of fact to evaluate the possibilities of tampering, substitution, or mistake. Accordingly, Mullins has failed to demonstrate a reasonable probability that a motion to strike Mr. Huys' testimony, based on the sexual assault kit, would have been granted."

(R. 207). Our review of the evidence comports with the trial judge's colloquy regarding the chain of custody over the "rape kit." While the trial judge himself did not conclude that a motion to strike Huys' testimony based upon failure to establish a chain of custody would definitely be denied, we cannot foresee any other result as the testimony before us fails to indicate *any* possibility of tampering, substitution, or mistake.[5]

Furthermore, we are not convinced that if a motion to strike Huys' testimony had been made and granted that there would then exist a probability of a different result sufficient to undermine the reliability and fairness of the trial. There was substantial other evidence supporting Mullins' conviction beyond a reasonable doubt, including: the direct testimony of H.C. and B.C. as to Mullins' commission of the act; testimony from Faren Young that Mullins admitted the commission of the act; testimony from Police Officer Reynolds that Mullins admitted attempting vaginal intercourse with H.C.; and testimony from the doctor who examined H.C. that her injuries were consistent with anal intercourse.

Mullins has failed to demonstrate the prejudice component of the *Strickland*

---

**5.** We acknowledge that there may have been some discrepancies in the chain of custody evidence in the first trial of this case in that the nurse, Kimbrell, who assembled the "rape kit" suggested that each glass slide containing H.C.'s rectal swab would have been etched with a diamond stylus for identifying it, whereas no such etching in fact appeared. At the second trial Kimbrell explained that at the time H.C. was examined, it was not yet hospital policy to etch every slide. Kimbrell testified at the second trial that she marked the "rape kit" itself with her name, the doctor's name, the victim's name and the date placing the slides and other evidence into the cardboard container and sealing that container. At the second trial Kimbrell plainly stated that she did not mark the slides of H.C. themselves. Consequently any defect in the chain of custody at the first trial was cured by the explanatory testimony at the second trial.

standard and therefore cannot succeed on his ineffective assistance of counsel claim.

Judgment affirmed.

STATON, P.J., and HOFFMAN, J., concur.